MARTHA A. SNYDER v. WAGNER ELECTRIC MANUFACTURING COMPANY, Appellant.

Division One, July 19, 1920.

1. **PLEADING: Sufficient Cause: Raised After Verdict.** There is a difference between a failure to state a cause of action and a defective statement of a cause of action. If the objection that the petition does not state facts sufficient to constitute a cause of action is not raised by demurrer, but only after answer and instructions and a verdict for plaintiff, it will not be sustained if enough appears in the petition to indicate plaintiff's right of recovery.

2. ———: ———: **Unsafe Electric Appliances.** A petition which charges that deceased was put to work at an iron boring machine, and directed to place certain appliances thereon and to drill holes in them with a hand-drill operated by electricity; that he was not an electrician, but was unfamiliar with the attachments, which defendant well knew; that the machine was "grounded" or electrically connected with the ground which supported it; that over the machine was a drop cord, coming down from the ceiling and terminating in a brass-incased socket about as high as a man could reach from the ground; that the current from the cord was used for power and was applied to the drill by inserting in the socket the plug on the end of the flexible cord attached to the drill; that when so connected, the electricity caused the electric armature of the drill to revolve and bore the holes in the iron he was directed to bore; that the drop cord was intended to carry and usually did carry approximately 110 volts of electricity; that the socket attached to said cord was and long had been, as defendant knew, in such defective condition that it was likely to permit, and did permit, such electricity as might be on the cord to escape to the hands of one touching the brass socket and form a circuit of electricity through the body of the person so touching it; that when deceased had finished drilling the holes and it was necessary to disconnect the drill from the socket, he attempted to do so in the usual way, and as he touched the socket he received a shock from which he instantly died, all definitely alleged, states a cause of action for damages by the wife of deceased.

3. ———: **Wherefore.** The word "wherefore," and "as above stated," used in the conclusion of a charge of negligence, carry back and call for the preceding allegations, for the purpose of identifying the acts included in the concluding general allegation of negligence.

4. ———: **Negligence.** A charge that defendant knowingly furnished deceased with certain defective and unsafe appliances with which to work, is equivalent to a charge of negligence.

5. ———: **Electricity: Current of 110 Volts: Not Alleged to Be Deadly.** A charge that the cord, to which was attached a brass socket and which deceased touched just before he sank down and instantly died, was intended to carry and ordinarily did carry a current of 110 volts of electricity, with no charge that the current was deadly or that it was limited to that amount, cannot be held to totally fail to state a cause of action, the plaintiff having no means of knowing that the current was sufficiently intense to kill her husband instantly, except from the result, and those things being well pleaded.

6. **ELECTRICITY: Cause of Death: Immutable Laws of Nature.** Where the factory was of immense proportions, practically filled with machinery propelled by electricity, carried into and through it by wires of both high and low voltage, the facilities for grounding the electric currents were numerous and close at hand, and the current kills if, in passing through the human body it reaches the ground, the law imposes upon courts the duty of applying the immutable laws of nature to the situation, with the assistance of available expert testimony, in determining whether the jury, in the light of the circumstances, might lawfully have found that a workman, on a non-insulated but grounded platform, in attempting with his thumb and fingers to disconnect the plug at the end of a flexible wire attached to a hand-drill, from the socket of a overhanging wire which ordinarily carried 110 volts of electricy, came to his instant death from the effects of the current, instead of from the effect of a luncheon he had just eaten, or the tobacco he may have swallowed or some unknown cause. And where the evidence shows that the workman had, in an attempt to unscrew the plug from the socket, taken hold of the socket, and immediately sank down dead, and his thumb and fingers were burnt, the inference is that the wire in the socket was not insulated, and that it was the electricity which had passed from the wire into the brass socket that caused his death.

7. ———: **Negligence: Notice of Safe Condition: Conclusive Proof.** The maintenance of a socket on an overhanging electric wire, into which was to be inserted a plug on the end of a flexible wire attached to a hand-drill, the wires maintained for the purpose of supplying power to the drill, amounts to notice to the workman operating the drill that it is in safe condition and an invitation to use it, and the law imposes upon the master the duty to exercise the utmost care and prudence to maintain it in a safe condition; and the fact of the death of the workman, immediately upon placing his fingers on the brass socket for the purpose of disconnecting the two wires, is conclusive proof, where the master had knowledge of the condition, not only of defective insulation of the wire in the socket, but of the negligence of the master in maintaining it in that condition.

8. ———: ———: **Knowledge of Defective Condition.** A charge of the master's knowledge of the defective condition in an appliance with which the servant was required to work includes a charge of negligence in obtaining knowledge.                      ,

9. ———: ———: **Current of 110 Volts: Cause of Death: Question for Jury.** If a current of electricity is dangerous to human life to any extent, it is the duty of the master to use and maintain such insulation as is ordinarily used to prevent that result; and where

there was evidence that the wire ordinarily carried 110 volts of electricity, and there is evidence that death does not usually result from such voltage, the issue whether the workman's instant death was caused by electricity when he touched the brass socket attached to the uninsulated wire is properly submitted to the jury by an instruction telling them that they could find for the plaintiff if it should appear that such a current was dangerous, that it had caused the death of plaintiff's husband, and that defendant had not used ordinary care to prevent its passage through his body to the ground.

10. ———: **Discovering Defective Insulation.** The law does not impose upon the master the duty to search through the ramifications of a large electrical system to find the particular place from which a fatal current may emanate, and the means and courses by which it may find a particular socket which the workman may hold in his hands; but it does require him to discover that a particular appliance which he directs his servant to use is not insulated and is defective and has become charged with a sufficient current to kill him while engaged in the performance of his directed work.

11. **EVIDENCE: Interest of Indemnifying Insurance Company.** In the trial of a case upon its merits the jury are entitled to know everything that affects the credibility of witnesses and the weight to be given their testimony, including their interest not only in the subject-matter, but in the parties who are to profit or lose by the verdict; and where a casualty insurance company chooses to come before the trial jury in the place of the record defendant, and with its own witnesses, the plaintiff has a right to ask them if in what they did pertaining to the accident they represented the insurance company, and also to ask a physician, who conducted the autopsy, if in doing so, he was not the paid agent of said company.

Appeal from St. Louis City Circuit Court.—*Hon Karl Kimmel*, Judge.

AFFIRMED.

*Holland, Rutledge & Lashly* for appellant.

(1) The court erred in refusing to give the peremptory instruction offered by appellant at the close of all the evidence, because respondent failed to prove facts sufficient to constitute a cause of action. The pleader was

limited to two specifications of negligence, an alleged defective socket, and an alleged defective drill. The petition contained an averment that a current of 110 volts was maintained on the circuit, but no averment that such current was dangerous, much less any averment that appellant knew, or, by the exercise of ordinary care, would have known of such danger. The master is not an insurer of his servant's safety. To recover it was incumbent upon respondent to prove: (a) That respondent maintained a dangerous current of electricity on the appliances in question. (b) That such danger was known to appellant, or, by the exercise of ordinary care, would have been known to appellant. (c) That the socket or drill were in such defective condition as to allow a dangerous current of electricity to escape to the person of deceased. (d) That deceased received a dangerous current of electricity that resulted in his death. None of the foregoing matters were proven by respondent. Orcutt v. Century Bldg. Co., 201 Mo. 443; Waldhier v. Railroad, 71 Mo. 514; Price v. Railroad, 72 Mo. 414; Ely v. Railroad, 77 Mo. 34; Bartley v. Railroad, 148 Mo. 124; Feary v. Railroad, 162 Mo. 75; McGrath v. Railroad, 197 Mo. 105; Graney v. Railroad, 157 Mo. 666; Fuchs v. St. Louis, 167 Mo. 620. (2) The court erred in not discharging the jury, and continuing the case upon motion of appellant, on account of the statement made by counsel for respondent in his opening statement to the jury, by which counsel conveyed the idea to the jury that the case was being defended by some company other than the defendant itself. The controversy in this case was wholly and solely between respondent and appellant. The purpose of this question was to convey to the jury the idea that some insurance company was interested in the outcome of the litigation. This constitutes error. Burrows v. Likes, 180 Mo. App. 447; Gore v. Brockman, 138 Mo. App. 231; Trent v. Printing Co., 141 Mo. App. 437. (3) The court erred in giving instruction number 1 at the instance of respondent. (a) It is error for a plaintiff to go to the

284 Mo.—19

jury in a case of this kind without an instruction stating to the jury under what circumstances the plaintiff is entitled to recover. (b) The instruction is erroneous because it contains an hypothesis of the jury finding for respondent under "other instructions given." There were no other instructions given under which the jury were authorized to find for respondent. Johnson v. Railroad, 117 Mo. App. 308; Allen v. Transit Co., 183 Mo. 432. (4) The court erred in allowing respondent's counsel to argue the case when respondent had asked no instruction with reference to the law governing the case. Powell v. Railroad, 255 Mo. 420.

*Leonard & Sibley* and *Shepard Barclay* for respondent.

(1) The statement for appellant omits to state what facts in the record raise the points and questions argued. It does not mention any rulings whatsoever, or the facts on which they arose, nor quote or refer to any instructions (given or refused) for either party, or any motion for new trial or in arrest. It is neither a "clear and concise statement of the case" (as required by statute) nor a "fair and concise statement of the facts," as required by the Rule 15 of this court. It should be adjudged insufficient to raise any question for review, and the judgment be affirmed or the appeal dismissed, if such requirements have any meaning worth enforcing. R. S. 1909, sec. 2080; Long v. Long, 96 Mo. 180; Jayne v. Wine, 98 Mo. 404; Clements v. Turner, 162 Mo. 466; Bank v. Kropp, 266 Mo. 218. (2) The motion in arrest was not well taken. The petition states a cause of action. The facts as to defective condition of the socket, and of the motor-drill are alleged as being "with knowledge" of defendant and that Snyder received "a shock or shocks of electricity of such intensity that he died" and the other details of defendant's negligence, are fully given, and show liability. Myers v. City, 189 S. W. 816. (3) For the same reasons and under the evidence, the per-

emptory instruction was properly denied; operators of electrical power have an affirmative duty to use reasonable care not to allow escape of enough current (whatever the voltage) to kill employees engaged in work in their plants, and using due care in so doing. Curtis, Electricity (1915), sec. 597, p. 910; Von Treba v. Gas Co., 209 Mo. 648; Geismann v. Elec. Co., 177 Mo. 654. Insulation is an affirmative positive duty. Curtis, Electricity (1915), sec. 594, p. 908. (5) Employers of establishments using electricity are bound to exercise reasonable care in control of currents, appliances and electrical apparatus to diminish the risk of injury to employees in their service; and when death from electric shock ensues to an employee, who is free of fault, it may be considered along with other circumstances. Curtis, Electricity (1915), sec. 597, p. 910; Myers v. City, 189 S. W. 810; Transit Co. v. Requenca, 224 U. S. 89; Delahunt v. Tel. Co., 215 Pa. 241; Ry. v. Newton, 118 Va. 222; Hicks v. Tel. Co., 157 N. C. 519; Kampman v. Mendoza, 141 S. W. 161. (6) There was no error in overruling defendant's motion to discharge the jury, during plaintiff's opening statement. The statement of counsel did not mention insurance. Even if it did, the trial court is to decide whether it had any prejudicial effect. Only where the trial court, or court having authority to review the facts, "is satisfied that the verdict of the jury has been influenced thereby" should an express reference to such insurance be considered error. Cement Co. v. Hatt, 231 Fed. 618; Egner v. Curtis Co., 96 Neb. 18, L. R. A. 1915A, 157. And a reference in good faith to insurance (on the *voir dire*) is not error in this State. Meyer v. Mfg. Co., 67 Mo. App. 389; Yates v. Wrecking Co., 195 S. W. 549; Saller v. Shoe Co., 130 Mo. App. 712. If the remark in the opening statement was improper, defendant should have asked a ruling or instruction to disregard it; which was not done, but would have been the proper remedy. Mcginnis v. Loring, 126 Mo. 404; O'Mellia v. Railroad, 115 Mo. 205. (7) No facts tending to account for the death

of Snyder other than by electric shock were offered by defendant, or to rebut the prima-facie case made by the plaintiff, so that the judgment should be affirmed. Williams v. Elec. Co., 274 Mo. 1; Von Treba v. Laclede Co., 209 Mo. 648; Williams v. City, 177 Mo. App. 177. That result should follow even if there were errors of procedure in the record, as the latter would then be immaterial, and not prejudicial to the substantial rights of defendant upon the merits. R. S. 1909, secs. 1850, 2082; Williams v. Elec. Co., 274 Mo. 1; Railway v. Moore, 228 U. S. 433; Shinn v. Railroad, 248 Mo. 173; Walsh v. Exposition Co., 101 Mo. 534; King v. King, 155 Mo. 406; Woody v. Railway, 104 Mo. App. 678; Lancaster v. Collins, 115 U. S. 227.

BROWN, C.—This is an action instituted by respondent to recover damages for the death of her husband Louis Snyder on February 10, 1917, in defendant's factory in St. Louis County, while in its service and engaged in his work in connection therewith. The cause was tried upon a second amended petition and defendant's general denial thereto, at the April term of the Circuit Court for the City of St. Louis and resulted in a verdict and judgment for the plaintiff in the sum of $8000. No objecton was made to the petition by demurrer or motion, or otherwise than by objection to the introduction of any evidence. The trial proceeded upon the merits to the end, but at the close of the plaintiff's testimony in chief the defendant requested an instruction which it names in its abstract as "demurrer to plaintiff's evidence" and which is as follows: "The court instructs the jury that under the law and the evidence in this case your verdict must be for the defendant," which was refused by the court, and defendant thereupon introduced a great quantity of evidence to sustain the issue on its own behalf. After verdict it duly filed its motion for a new trial, which was overruled, and its motion in arrest, which was also overruled. The motion in arrest assigns

as a ground therefor: "That the petition does not state facts sufficient to constitute a cause of action against the defendant." While the appellant does not, in his statement, favor us with any reference to the contents of these motions, we will take for granted that the motion for a new trial is sufficient to raise the points relied on in its argument.

The second amended petition, against which the appellant's attack is largely directed, states, in substance, that the defendant corporation owned and operated a plant in St. Louis for the manufacture of electric appliances; that the deceased, who was not an electrician, had long been employed by it in other departments, but was on or shortly before the date of the accident transferred to the motor department where it occurred, and where the surroundings and appliances were new and unfamiliar to him, and was there directed to place certain appliances upon a large iron boring machine and to fasten same by screws to be inserted in holes, which he was directed to drill for that purpose with a drill operated by electricity and which he was holding in his hand at the time of his death. That the building was a large one, containing much machinery run by electricity, with many electric wires, some of them carrying currents of high tension, passing through it in different directions. That the big boring machine was "grounded" and was operated by electric currents of high tension when at work, and iron rails and other pieces of steel and iron lay upon the floor and around the machine, all of which conditions were knowingly permitted and maintained by defendant, and were so placed and arranged as to make it probable that one working about the said machine would be likely to come in contact therewith, as the defendant well knew. The petition then proceeds to its conclusion as follows:

"That the defendant provided, and required her said husband to use in putting on said attachments, a small drill machine which was operated by electricity, by holding the drill in his hand or hands and boring holes in

metals and attachments on or about the said boring machine; that the said drill at the time was grounded and in such condition that electricity might escape and did escape to the fingers and hands and body of a person holding and using same, as defendant knew; that defendant provided the electric power to operate the said drill from a loose swinging drop cord, instead of a wall plug or other fixed and safe appliance, the said drop cord being connected with high-power main or feed wires maintained by defendant in the said plant and run to a point and suspended six or seven feet from the floor, directly over the top and near the center of the said boring machine, the said drop cord being installed by defendant and intended to be used for lighting purposes, and was usually used for that purpose in said plant, and in tended to carry and usually did carry approximately 110 volts of electricity, and the power for running the said drill was obtained by screwing in or inserting a plug on a wire attached to the drill, in a brass or metal socket attached to the end of the said drop cord suspended over the said boring machine as aforesaid, and the drill machine was disconnected by unscrewing or pulling out the said plug from the said socket in the drop cord; that the socket attached to the said drop cord was and had long been, as defendant knew, in such condition that it was likely to permit, and did permit, such electricity as might be on said drop cord at the time to escape to the hands of one touching the said socket and form a circuit of electricity through the body of the person so touching same; that when her said husband had finished the drilling of holes on the said boring machine, it became and was necessary for him, in the course of his said duties, to disconnect the said drill from the said socket, in order to connect it at other places to work on other machines; that in attempting to do so, in the usual way and in the way anticipated and provided by defendant, and while in the exercise of ordinary care on his part, and when he had one hand on the said socket and plug and one hand

on the said drill, and was in contact with the said boring machine and the said rails on the floor, owing to the negligence of the defendant he received, unexpectedly and without warning, a shock or shocks of electricity of such intensity that he died instantly or immediately thereafter as a direct result thereof.

"Plaintiff further states that at all times herein mentioned all of the machinery, appliances, equipment and power in said plant or factory were furnished and maintained by defendant, and were under its complete supervision and control and that the defendant then had and now has within its personal knowledge all facts as to the condition, works and workings of said machinery, appliances, equipment and power; that the said deceased was not an electrician and did not have charge of the care or keep or inspection of any of said machinery, appliances, equipment or power; and plaintiff states that the shock or shocks of electrcity given the deceased as aforesaid, was due to and caused directly by negligence on the part of the defendant.

"Wherefore, plaintiff states that through the negligence of defendant in causing the death of the said Louis Snyder, as above stated, she has been damaged in the sum of ten thousand dollars."

The plaintiff introduced evidence tending to prove the allegation of the petition, to which we shall refer *in detail* as necessary. Its general features, about which there is no substantial dispute, show that the manufacturing establishment of defendant in which the accident occurred and where electrical appliances were made was an extensive one, the building being about four hundred feet in length and two hundred feet wide, a space which one of the witnesses described as about half the area of an ordinary city block. The work with its appliances was divided into departments, the motor department where the accident occurred being upon the ground. It was lighted and all its machinery driven by electricity generated by defendant, and for this purpose many wires of

different potential capacity passed through it in different directions. The plaintiff's husband was a mechanic who worked on these machines, and not an electrician, and had never worked on this machine before. It was called a boring machine, constructed of iron and ten or twelve feet in length, four or five feet high and perhaps four and a half feet wide, and was "grounded;" that is to say, the highly conductive material of which it was constructed was electrically connected with the ground which supported it. Over it was a drop cord coming drown from the high ceiling and terminating in a brass incased socket about as high as a man could reach from the ground, the current from which was used for the purpose of lighting or power as desired, by inserting a plug in this socket which connected it with the service desired.

At the time of the accident the deceased had been directed to attach a guard or other appliance to some portion of the big machine with a screw or screws, which required holes to be drilled in the iron part to which the attachment was to be made. This was done with an electric hand-drill, which consisted of the revolving part which bored into the iron, the electric armature which revolved it, and a flexible cord containing the wires which connected it with the current overhead by a plug inserted in the socket which we have described. The drill, driven by the current so received, was held in the hands of the operator and properly handled to do it; work. The drop cord was intended to carry and did *ordinarily* carry a current of 110 volts electro-motive force which the evidence showed to be practically harmless to the human organism under all ordinary conditions.

In this case the deceased had finished his drilling, and held the metal drill in his left hand and reached up to the plug with the right to disconnect it from the socket. While doing this he sank down and almost immediately died. He was in good health at the time, and

a *post-mortem* examination showed his vital organs to be in good condition otherwise than a slight indication of incipient urinary trouble. There, were also indications of a light burn on the fingers and thumb of his right hand. The evidence also tended to show that the casing of the socket on the drop cord was separated, and that some of the employees who had used the drill had received electric shocks which they had reported, and that it was in that condition on the morning of the accident, although the drill had, in the meantime, been sent to the shops for repairs. There was no evidence of any repairs to the socket, although its condition had been noticed by employees.

After the evidence was in the request of defendant for a peremptory instruction was renewed, and upon its refusal by the court instructions were given at the request of each party. These are not set out in appellant's statement, for the reason, evidently, that they are unnecessary to the determination of the points made and argued in its brief. One of the instructions given at its request and relied on in argument by the respondent is as follows:

"The court instructs the jury that the defendant in this cause is charged with the following negligent acts:

"1. Defendant is charged with having furnished said Louis Snyder with a drill which at the time was grounded, and in such condition that electricity might escape and did escape to the fingers and hands and body of a person holding and using same, as defendant knew.

"2. Defendant is charged with negligence in providing the electric power to operate the said drill from a loose, swinging drop cord instead of a wall plug or other fixed and safer appliance.

"3. Defendant is charged with negligence in that the socket attached to the said drop cord was, and had long been, as defendant knew, in such condition that it was likely to permit, and did permit, such electricity as might be on said drop cord at the time to escape to the

hands of one touching the said socket and form a circuit of electricity through the body of the person so touching the same.

"And it is further charged that said acts of the defendant were the direct cause of the death of Louis Snyder.

"The court instructs you that the burden is upon the plaintiff to prove by a preponderance of the evidence the negligence charged, and if plaintiff can recover at all, it must be upon one of the alleged negligent acts hereinbefore set out, and plaintiff cannot recover herein upon any other negligent acts of defendant, if from the evidence you should find or believe that there are or were other negligent acts upon the part of the defendant at the time."

The action of the court upon certain other rulings upon which the appellant assigns error will be noticed as we proceed.

I. The first question raised by appellant is that the petition does not state facts sufficient to constitute a cause of action. This point covers and includes many of its assignments of error. It was not made Pleading; in direct attack upon the petition by demurrer Cause of Action. or motion, nor had any previous petition been held insufficient, so that the right of amendment remained intact. Under these circumstances the defendant joined issue by answer to the merits as stated in the petition, and went to trial.

After the testimony was heard it concurred in submitting the cause to the jury upon instructions framed by its own counsel, and after its unsuccessful experiment with the jury it asks us to hold that the issue they presented was a purely fictitious one.

The question so presented is not new in this court. In Young v. Iron Company, 103 Mo. 324, l. c. 327, this exact point being before us, we said: "The question of the sufficiency of the petition is one thing when raised by a demurrer, but another thing when raised after an-

swer, by way of an objection to the introduction of any evidence. Though the petition is informal and the cause of action defectively stated, still if it states facts enough to show a cause of action, then such an objection should be overruled. [Elfrank v. Seiler, 54 Mo. 134; Roberts v. Walker, 82 Mo. 200.]'' That case illustrates the difference between the failure to state a cause of action and the defective statement of a cause of action, which is the true test in the application of the provisions of Section 1804, Revised Statutes 1909, to determine whether or not the defect is waived by joining issue upon the merits. It is evident that if enough appears in the petition to indicate the existence of a right of recovery in the plaintiff, then the answer of defendant to the merits should be a sufficient indication of his satisfaction with the manner in which it is stated.

Without determining whether or not this petition needs the support of this statutory rule we will note its principal charges. It closes as follows: ''Wherefore, plaintiff states that through the negligence of defendant in causing the death of the said Louis Snyder, as above stated, she has been damaged in the sum of ten thousand dollars.'' The words ''wherefore'' and ''as above stated'' carry us back through the allegations of the petition to identify the acts included in this general allegation of negligence. We find ''that the shock or shocks of electricity given the deceased as aforesaid, was due to and caused directly by negligence on the part of the defendant.'' Here we have another charge of negligence expressly applied to every act previously stated as having resulted in the deadly shock or shocks of electricity by which Mr. Snyder is alleged to have been killed. These negligent acts and omissions from which the death is charged to have resulted are definitely stated, and may be classified under two distinct headings: (1) failure to furnish the deceased a safe place in which to perform the work required of him, and (2) knowingly furnishing him with unsafe appliances with which to

perform his work, likely to produce the very result upon which the claim for damages is founded. That the two specific charges of negligence we have already quoted apply to all the preceding averments by the use of the words "wherefore," "as above stated," and "as aforesaid" in direct connection with the negligence, is evident by the application of the plainest and simplest rules of grammatical construction, but the same meaning may be expressed even to a legal certainty by other words. For instance, one of the instruments with which the deceased was required to work was an electric drill which is charged to have been in such a condition that electricity might escape and did escape to the hands and body of a person holding and using the same, which the defendant knew. Another of these instruments was the socket on the end of a drop cord which the deceased was required to use in connecting the drill with the electric current which propelled it and which was, and for a long time had been, as defendant knew, in such condition that it was likely to permit such electricity as might be on said drop cord at the time to escape to the hands of one touching the socket and form a current of electricity through the body of the person using it. The charge that defendant knowingly furnished these defective and unsafe appliances is equivalent to a charge of negligence. It was also stated that this drop cord was intended to carry and *ordinarily* did carry a current of 110 volts, and that in disconnecting his drill from the cord in the usual and ordinary way he received a shock of such intensity that he died immediately. It also stated, in substance, that all these appliances and all knowledge of their condition were in defendant's control. It is true that it does not state that a current of 110 volts *ordinarily* carried by a cord was deadly, nor does it state that the current which it was carrying at the time of Snyder's death was limited to that voltage. Those were matters that the plaintiff had no means of knowing except from the result. She could only know that the current was sufficiently intense

to kill her husband instantly, and this was well pleaded. The petition was sufficient after answer to present the questions raised in the evidence and submitted by the instructions.

II. While there is nothing in the facts pleaded relating to the general condition of the shop in which this accident occurred constituting a substantive ground of negligence, it is important in its relation to the duty of care which it imposed upon the defendant in handling its electric appliances. The factory was immense in its proportions, this particular building covering, according to the evidence, approximately two acres of ground practically filled with machinery propelled by electric power generated by defendant, and carried into and through it upon wires of both high and low voltage. That this motive power is dangerous is a fact frequently brought to the attention of the courts, and that the care required in its use must be measured by the character of its danger has been so often judicially declared that its repetition is unnecessary.

Shop Conditions.

We have mentioned the importance, in its bearing upon this case, of the electric condition existing in this factory in connection with its facilities for "grounding" electric currents. This means discharging them into the earth, where they seek equilibrium with a force that makes them available in the industries. It is this quest which constitutes their destructive power. It kills by passing through the human body to reach the ground. If one is insulated by standing upon non-conductive material it is harmless to him. If he is connected by a good conductor to the ground the harmless current becomes deadly.

We suggest these things because they enable us to understand more clearly the evidence in this case. We have been aided by the defendant, which has strongly urged in its brief that we have in the common electric appliances with which many homes are lighted an illus-

tration of the exact situation in this case. The electricity was brought to the place by an electric cord which dropped down from the ceiling, ending in a socket which hung over a big iron machine about six feet from the iron-strewn floor on which the plaintiff's husband stood to perform his work,. He held in his hand a little iron drill used for boring screw holes in the metal wherever they were desired, and with this he had bored a hole in the big iron machine before him. This drill ran by electric power, and had attached to it an electric insulated cord ten or fifteen feet long with a plug on the free end, by which he attached it to the socket in the drop cord above his head, just as we attach a cord from a fan or movable light.

Before going to his luncheon the deceased had finished drilling a screw hole in the metal frame of the big machine beneath the drop cord. He turned off the current by a key at its connection with the drill. There was no key at the connection with the drop cord, so that the only way of breaking that connection was by unscrewing the plug by which it was made. Leaving it in this condition, the propriety of which is not questioned, he went to his luncheon, and on his return he and his helper prepared to disconnect the drill and remove it, with the other tools they were using in connection with the work, to the next job. The helper proceeded to gather up the tools, while the deceased stood up with his left hand on the drill, and reached up with his right hand to the connection with the drop cord to unscrew the plug and thereby disconnect it. In a moment, with a little sound like the word "ump," he sank to the ground, leaving the plug in its place. The helper, frightened, lifted him to his feet, and he again raised his hand. The plug came out. He sank to the ground and without any noise or convulsion was dead. The only explanation defendant offers of the cause of his death is that he had eaten too much luncheon or swallowed his tobacco, the autopsy having developed that he had

died with a full stomach and tobacco in his mouth, and a burn on the thumb and two first fingers of his right hand. We assume, and the jury evidently found, that his sudden death resulted from the passing of a current of electricity from his right hand between the thumb and fore fingers by which he held the brass casing of the socket in the drop cord, through his left hand resting upon the iron drill upon the great iron machine, or through his feet to the iron rails on which he stood.

The law imposes upon us the duty of applying the immutable laws of nature to this situation, with the assistance of such expert testimony as has been brought by the parties to our assistance, in determining whether or not the jury, in the light of these circumstances, might lawfully find that the deceased came to his death from the effects of an electric current instead of from the effect of his luncheon or tobacco or some unknown cause. The laws of nature are presumed to be within our ken, but, unfortunately, our own knowledge must be acquired largely from information and experience, and where these fail, the office of the expert witness begins. His experience is supplemented by the experience of others which constitutes the body of information which we call technical education. In this case we are invited to take into consideration our own experience with electrical apparatus in our homes, which we gladly do. Our electric light connection consists of a socket connected with our lighting current, cased with brass, insulated from the current by nonconducting material, through which the wires pass to a point inside the conductive casing which we might, should we try, reach with our finger. In making the connection it is found by a wire passing through a plug of insulating material which we screw up into this socket until the enclosed wire finds its contact with the current. If it is an electric light which we are connecting, it becomes incandescent the moment this contact is made. By unscrewing this plug we break the con-

nection, and the light inside the glass bulb goes out. As we try this experiment we notice that it is not necessary to *remove* the plug. This was the operation in which the deceased was engaged at the time of his death. The plug had not come out when he received the fatal stroke, but the connection was broken, and the current was transferred from the drill cord to his body and found the drill through his left hand which rested upon it. The coroner testified that the thumb and first two fingers of his right hand seemed to have been burned. This would happen and does happen from the effect of the electric current overcoming the resistance of the skin, which depends upon the degree of its moisture and its character whether acid or alkaline. From the burns on his thumb and fingers the jury might well have found and no doubt did find that at the instant of the deadly stroke Snyder was grasping the casing of the socket from which he was removing the plug with his thumb and first fingers, which he must have done to hold the socket in place while he unscrewed the plug. This being true the electricity was transferred through the casing of the socket to his thumb and fingers the instant the contact was broken and before the plug was fully unscrewed. This, of course, could not have happened had the wire in the socket been properly insulated. The defective condition of the socket is a ground of negligence specifically charged in the petition, and that it was in bad condition or insufficient for the purpose for which it was used if the current was in the casing cannot be and is not denied. That the conditions in the place were favorable to the unfortunate result is evident without the assistance of the higher education which constitutes the expert. It was stated with much force in argument before us in Vessels v. Kansas City Light & Power Company, 219 S. W. 80, where the point was made that the laundry company which permitted the use of a plug and socket connection of this character and with a similar casing to be used in its basement and

boiler room where the conditions were favorable for grounding a light current, was guilty of negligence contributing to the injury of one of its employees. It was not necessary for this court to rule the point because we held that Mr. Vessels was not charged with the negligence of his employer, but the circumstance impressed upon us the operation of a natural law so simple and universal as to be within our constant observation.

That the cause of this accident was the charging of the casing of this socket by which it must be handled with a current so potential that it caused the death of plaintiff's husband is amply shown by the evidence. That this could only result from defective insulation is equally well established. Its maintenance for that purpose amounted to notice that it was in safe condition and an invitation to so use it, and the law imposed upon the defendant the duty to exercise the utmost care and prudence to maintain it in that condition, and the fact of the death of Mr. Snyder from the effect of an electric current which passed through his body from contact with the casing by reason of the defective insulation of the wire within it would be conclusive proof, not only of the defect of the insulation, but of the negligence of defendant in its maintenance in that condition. [Geismann v. Missouri-Edison Electric Co., 173 Mo. l. c. 678 and cases there cited.] The words ''conclusive proof'' as used in those cases are not intended to exclude proof that the defective condition results from a cause over which the defendant had no control and no opportunity to correct; but as we shall presently see, no such case is presented here. On the contrary, there is evidence tending strongly to prove that the defective condition of this appliance was known or ought by ordinary observation to have been known by the defendant through the employees charged with its maintenance.

Knowledge, as we have seen is directly charged, but counsel, with a refinement of reasoning too subtle for practical application, say that the charge of knowledge

284 Mo.—20.

does not include the charge of negligence in obtaining knowledge. It is sufficient to say that it covers, especially after issue voluntarily joined by answer, all knowledge imputed by the law, whether actual or constructive.

III. Defendant directs our attention to the fact that the petition charges that the drop cord was intended to carry and, did *ordinarily* carry a current of 110 volts of electro-motive force and that, although **Voltage.** it states that the deadly current which caused the death of Mr. Snyder was negligenly permitted to pass through it, it does not give the particulars explaining how a current of such potency could have gotten upon that cord and the casing of its socket, and that, therefore, we are dealing with a current of the potency of 110 volts, which it alleges to be harmless, although it killed Snyder. While we would not ordinarily consider it necessary to notice this argument otherwise than it is involved in what we have said with reference to the sufficiency of the petition, there is another phase of it which goes to the effect of the evidence as to the real cause of Mr. Snyder's death.

One of the charges of negligence submitted at the request of defendant in the instruction we have quoted is as follows:

"Defendant is charged with negligence in that the socket attached to the said drop cord was, and had long been, as defendant knew, in such condition that it was likely to permit, and did permit, such electricity as might be on said drop cord at the time to escape to the hands of one touching the said socket and form a circuit of electricity through the body of the person so touching the same."'

It presented no evidence whether or not there was a more potential current upon the drop cord at the time of the accident. As to the particular current that might be on the drop cord at the time, it asked and the court gave an instruction to the effect that if the electric circuit to which the drill was attached *at all times* car-

ried a voltage of 110 volts which was not likely to injure a person coming in contact therewith and that if defendant believed and had good reason to believe that said voltage would not injure such employees as might come in contact with it, it was only bound to use the care ordinarily used by persons under such circumstances. Defendant's theory was evidently that such current was under no circumstances dangerous.     Mr. Langsdorf, professor of electrical engineering and dean of the school of engineering of Washington University, after testifying to his own experience in electrical engineering, and that he frequently tested currents of that intensity with one hand, and that he did not consider it dangerous to do so, explained that he always did it with the fingers of *one hand*, but never with *both*.     The substance of all this testimony was that while there were some instances in which such a current passing through the body had caused death, such result was rare.     We refer to this feature of the trial to show that the question was fairly submitted to the jury in words of defendant's choice, and that they were not misled as to its significance in connection with other issues in the case.     It simply permitted a verdict for the plaintiff if it should appear that such a current was dangerous, had caused the death of Snyder, and that defendant had not used ordinary care to prevent its passage into and through his body to the ground.     If such a current was dangerous to human life to any extent, and this does not seem to have been disputed, it was the duty of defendant to use and maintain such insulation as is ordinarily used in such cases to prevent that result.

IV.     As we have already indicated, we think the petition clearly charges negligence in permitting *the current which killed Snyder* to pass into the

Discovering Defect.     casing of the socket which he must necessarily handle in doing this work, and from which, under the conditions which existed in his working place, would necessarily pass through his body to the ground,

from whatever source it might emanate. There were, as is shown by the evidence, many wires of all potentials passing into and through the building, all of which were located, erected and maintained by the defendant and charged with electricity which it generated upon other premises. If the law imposes upon plaintiff the duty to search through the ramifications of its electrical system to find the particular place from which the fatal current emanated and the means and course by which it found the particular socket which the deceased held in his hand at the time of his death, it would amount to an absolute denial of justice. These ramifications were an absolutely closed book to all persons other than the electricians charged with the construction and maintenance of the wires and other appliances. There are two ways, however, in which this deadly agent is always liable to escape. One is through escape from high potential wires to those of lower voltage by actual contact of the naked wires. The other, and perhaps the most common, is through defects in the transformers which change the high potential currents of primary wires to the lower voltage required for lighting and running fans and other small machinery. In this case the care of the drop cord as well as of the whole system from which it obtained or might obtain its current rested upon the defendant alone, and when it permits an appliance which it requires its servant to handle to become charged to such an extent as to kill him in the performance of that duty as in this case, it is something different from a mere omission. The employer has generated the force which kills, and has taken it step by step along the pathway that leads to the tool which it places in the hands of the victim, already loaded with the deadly charge.

V. In his opening statement to the jury Mr. Sibley, of counsel for the plaintiff, said:

"We shall show you, gentlemen, that Doctor Denny, a physician of high standing and of long practice, and

the Coroner in St. Louis County, performed a coroner's inquest over this man at the Wagner Electric Manufacturing Company's plant that afternoon, and later that night performed an autopsy on the body. We shall show that this autopsy that night on the body was performed in part at the request of the defendant, or the company interested in defeating this claim, at that time." At this point the defendant objected to the statement, and moved that the jury be discharged, which was denied by the court after a conference out of hearing of the jury, and the defendant excepted.

*Disclosing Interest of Insurance Company.*

Afterward, and during the trial, the defendant called one Bowser, a witness in its behalf, who testified that he was master mechanic at the factory where the accident occurred and that three or four days afterward he had taken the socket down from the place where Snyder was at work when he died. On cross-examination he said that he did not know whether it was the same socket or not; that he had not looked at it from the .time of the accident on Saturday until Tuesday or Wednesday when he took it down and paid no particular attention to it. His cross-examination proceeded as follows:

"Q. Who was it suggested to you to take down the socket? A. In talking to the——

"Mr. Houts (interrupting): I object to that ques-. tion as immaterial, who suggested it.

"The Court: He may answer that.

"To which ruling of the court the defendant, by its counsel, then and there duly excepted, and still continues to except.

"The Witness: I was talking to the representative of the insurance company——

"Mr. Houts (interrupting): Now, that is just exactly the reason I made the objection, and I make the objection and I move that the jury be discharged." This was denied.

An inquest was held by the coroner of St. Louis County at about five o'clock of the afternoon of the

accident, and later the coroner was present at an autopsy held at an undertaking establishment in the city. When asked at whose request this was done objection was made by defendant and sustained by the court. Mrs. Snyder testified that they told her at the plant before the autopsy that there would be no cutting on the body, while in fact every cavity, including that of the brain, was opened. Dr. Scherck assisted at the autopsy and testified at great length about the conditions indicating or not indicating the cause of death, but upon objection of defendant in behalf of whom he testified, was not permitted to tell upon cross-examination whom he represented or by whom he was paid except that it was not by plaintiff.

We have referred to these incidents of the trial because of the importance which the defendant attaches in argument to the right which he asserts to disguise an insurance company in its own clothing before the jury. It is possible that sometimes a jury might be influenced by the fact that the defendant of record has no substantial interest in the result because another has been compensated for its obligation to reimburse him. One thing is true. The jury should, so far as possible, be required to find their verdict upon the facts, without fear, favor or sympathy with respect to either party. It may be that in some cases the reason of the rule goes so far that, while the identity of those so fortunate or unfortunate, as the case may be, to be parties to the record, cannot in the nature of things, be concealed from the jury, it is the duty of the court to conceal from them the identity of the real parties in interest.

It is not suggested, either by brief or in oral argument of counsel, that a casualty insurance company is not taking the burden of the defense of this case, as it has the perfect right to do. It has not only the right, but the obligation often rests upon it to protect its stockholders against wrongful claims in all legitimate ways, and the defense of suits not founded in honest

liability is one of those ways; but in the trial of such cases upon the merits the jury is entitled to know everything that affects the credibility of witnesses and the weight to be given their testimony, including their interest not only in the subject-matter, but in the parties who are to profit or lose by the verdict. This goes not only to contractual relations with reference to the subject-matter of their testimony, but to their friendships and enmities.

In this case the court did not permit plaintiff's counsel to proceed with the statement. Counsel had simply said that the evidence would show that the autopsy "was performed in part at the request of the defendant, or the company interested in defeating this claim at that time." He had not yet said that it was an insurance company, and had no opportunity to continue by stating what the evidence would show.

With this interesting record before us we will assume that had Mr. Sibley been permitted to proceed he would have said that the evidence would show that immediately upon the death of Mr. Snyder an insurance company, through one Mr. Lansing, its agent, took charge of the preparation of the defense of an expected suit for damages. That after an inquest, which was immediately held by the county coroner, he caused the body to be taken to an undertaker's establishment in the city, after a promise to the plaintiff, who was entitled to its control, that it would not be mutilated. That it employed Doctor Scherck, one of the principal witnesses for the defendant, to attend and assist at an autopsy, in which the body was opened from the throat to the bottom of the abdomen and the organs removed and emptied of their contents and examined, and the top of the skull taken off to examine the tissues of the brain, and returned it to plaintiff in that condition. That three or four days after the accident it went to the defendant's factory and caused a socket to be taken down from the place where it occurred, to be held by

one of its witnesses until the trial, and that counsel present in court to examine these and all other witnesses were employed by it and not by the defendant.

While it may be, as we have said, it would have been error to have disclosed to the jury the fact that an insurance company was bound by contract to indemnify the defendant for any amount recovered had it kept out of the suit, it chose to come before the trial jury in the place of the record defendant, and with its own witnesses. When Mr. Bowser testified the plaintiff had the right to ask him if he was not an employee of the defendant, and for the same reason and for the same purpose had the right to ask him if he was not there for the insurance company which produced him. For the same reason the plaintiff had the right to ask Doctor Scherck if he was not the paid agent of the insurance company with respect to the subject of his testimony. The case as it is presented in this record could not have been honestly placed before the jury without the disclosure of the relation which these witnesses sustained to the company. The defendant has no cause to complain of the position in which it placed itself for its own profit, or to shift the burden which it voluntarily assumed to the shoulders of the plaintiff.

The defendant on this point cites Burrows v. Likes, 180 Mo. App. 447; Gore v. Brockman, 138 Mo. App. 231, and Trent v. Printing Co., 141 Mo. App. 437. The first two of these cases have no bearing upon the question here presented. In the Burrows case the Springfield Court of Appeals held that it was not error to ask jurors examined on their *voir dire* if any of them were employees of certain insurance companies. In the Gore case it was held error on cross-examination to ask a physician testifying in a suit against him for malpractice, whether or not he took out protective insurance to guard against damages that might accrue in such suits. In neither of these cases was an insurance company present in court occupying the place of the record defendant.

In the Trent case, supra, there is nothing in the report to indicate that the insurance company took charge of the trial of the case or interfered in any way with the preparation and production of evidence, and the language used by the Kansas City Court of Appeals should be confined to the question before it. That court summed up the matter by saying of the plaintiff: ''He cannot ask unliquidated damages of a good man who may have injured him and then substitute a bad man at the trial.'' There is no ''bad man'' here. We do not think there is anything in that case inconsistent with the views we have expressed. In this case counsel have confined their argument to the statement to the jury which we have quoted, omitting, for obvious reasons, to mention subsequent offers by plaintiff of evidence to sustain the theory we have assumed. The court interfered by sustaining the defendant's objection before insurance had been mentioned, and offered to instruct the jury to disregard what had already been said. We do not think the incident had then reached a stage demanding the discharge of the jury which had heard it, even upon the ''bad man'' theory so urgently pressed by appellant.

We think the case was well tried, the verdict amply sustained by the evidence, and we find no prejudicial error in the record. The judgment of the Circuit Court for the City of St. Louis is accordingly affirmed. *Ragland* and *Small, CC.*, concur.

PER CURIAM:—The foregoing opinion of BROWN, C., is adopted as the opinion of the court. All of the judges concur, except *Woodson, J.,* absent.