BENJAMIN M. POWERS, RECEIVER, ETC., RESPONDENT, v. T. K. ELLIOTT ET AL., DEFENDANTS; CHARLES W. SCARRITT, APPELLANT.*

Kansas City Court of Appeals.   June 27, 1927.

*Corpus Juris-Cyc. References: Corporations, 14CJ, section 1596, p. 1027, n. 92; section 1774, p. 1127, n. 97; section 1776, p. 1129, n. 65; p. 1130, n. 66; Trial, 38Cyc, p. 1925, n. 72.

*Benj. M. Powers, pro se.*

*Scarritt, Jones & North* for appellant.

WILLIAMS, C.—This is an action by Francis M. Hayward as Receiver of the Commercial Savings Company against T. K. Elliott, C. W. Scarritt and others. A judgment was rendered for plaintiff, and defendant Scarritt has appealed to this court.

No attack was made upon the petition before the trial. However, a vigorous attack is now made upon the petition, and therefore we set out portions of the petition as they apply to the objections here made.

"That the Commercial Savings Company was incorporated under the laws of Missouri on the 23rd day of March, 1922, with a capital of $200,000 with 2000 shares of stock of the par value of $100 each; that none of such stock has been paid up, that in July, 1922, said company took a lease at a high monthly rental upon a banking room in the Scarritt Building in Kansas City, Missouri, and began to do a banking business at a great expense and invited the public to become depositors therein; that on the 2nd day of December, 1922, said company had dissipated the deposits of the depositors and had become hopelessly insolvent owing to its depositors and other creditors over $13,000 and had less than $500 in cash when said receiver was so appointed; that said receiver under the order of the court has already allowed claims against said company to the amount of $13,474.69 on which the wife of W. L. Jones has paid $742.70 and said W. L. Jones has paid $100 leaving still subsisting claims in the amount of $12,631.99; that there are in said receiver's hands funds not exceeding $250 of available assets with which to pay such claims and costs of suit.

"That defendant Charles W. Scarritt being a stockholder in the company owning the Scarritt Building and for the purpose of renting banking room in such building to the Commercial Savings Co., on or about July 25, 1922, procured from said W. L. Jones sixteen shares of stock in said company and permitted his name to be used as vice-president and director of said company for the purpose of attracting depositors to said company and by reason thereof great numbers of depositors were attracted to said company and intrusted their savings to said company, and that said Charles W. Scarritt knew (or by the exercise of ordinary care could have known) that no part of such stock was paid up in said Commercial Savings Company; that the par value of said stock so procured by said Charles W. Scarritt was $100 per share; that at the purchase of same said defendant promised to pay to said company the par value, to-wit, $1600.

"That there are no other solvent stockholders whose stock is unpaid within the jurisdiction of this court and the plaintiff is wholly without adequate remedy at law; that the officers of the company put up on the windows of said banking room where all the public could and did see the name of the company and the statement that its capital was $200,000 which facts all said defendants knew and permitted to

be done and by reasons whereof many persons who are now creditors of said company believing said statements to be true and that said company had a paid up capital of $200,000 deposited their money in said company which implied promise said defendants ought in equity and good conscience be compelled to make good.''

In the petition judgment is then asked for the value of the stock so unpaid and which was issued to defendant C. W. Scarritt.

The answer of defendant Charles W. Scarritt, was a general denial.

The evidence showed the appointment of the receiver and order authorizing the institution of this suit.

As to the claims and insolvency of the company there is no question.

The articles of incorporation of the defunct company were offered in evidence. In these articles of incorporation it was recited:

''That the amount of the capital stock of the company is two hundred thousand dollars ($200,000) divided into two thousand (2,000) shares of the par value of one hundred dollars ($100) each; that two hundred thousand dollars ($200,000) thereof has been in good faith subscribed, and one hundred thousand dollars ($100,000) thereof actually paid up in lawful money of the United States and is in the custody of the persons named as the first board of directors or managers.''

The record shows: ''Although the articles of incorporation of the Commercial Savings Company recited that $100,000 of the capital stock of said company was actually paid up in lawful money of the United States and was in the custody of the persons named as the first board of directors or managers, as a matter of fact no cash had been paid and no money in any amount had been paid by the subscribers for said stock and there was no money in the hands of the directors named in said articles, at the time of the signing of said articles or at the time of the issuance of the certificate of incorporation of said company. The directors of the Commercial Savings Company at the time of its incorporation held a certificate of deposit for $110,000 issued by the Central Trust Company but the Central Trust Company was merely a paper corporation and the certificate of deposit so issued by it did not represent or evidence the deposit of any money with the Central Trust Company by the new company or its directors. The Commercial Savings Company began its business in the Scarritt Building shortly after the issuance of its certificate of incorporation.''

The stock book showed: ''Sixteen shares issued to C. W. Scarritt; dated July 25, 1922; transferred from W. L. Jones.''

The stock certificate which was introduced in evidence corroborates the entry in the stock book.

The defendant did not sign any subscription for stock.

W. L. Jones seems to have been the moving spirit in the enterprises and testified that he had no money or property with which to pay the claims or creditors of the company.

Witness Jones testified that he had never discussed with any one of the persons who acquired stock the manner of incorporation nor informed them that the stock had not been paid for.

It seems that at a meeting of the Executive Committee, Mr. C. W. Scarritt was elected a director in the Commercial Savings Company but was never notified of this election. The evidence shows that W. L. Jones received a letter from C. W. Scarritt, the letter having been lost the witness gave the contents as:

"He agreed to act as vice-president of the company if elected, provided the business was handled according to law, the way he worded it. I am not sure just what it was, but something along that line."

This letter was written about the time Mr. Scarritt took the stock.

The Commercial Savings Company was the successor to the Central Trust Company. The change of name being by reason of the fact that the name of "Central Trust Company" was not available.

A contract was offered in evidence between C. W. Scarritt, W. L. Jones and Commercial Savings Company which is as follows:

"In consideration of the execution by Second Parties of a lease on the banking room in the Scarritt Building in the said city, owned by The Scarritt Estate Company, in which First Party is interested, which lease has this day been executed, said Scarritt has agreed to purchase and has this day purchased from said Jones sixteen (16) shares, of the par value of $100 per share, of the capital stock of said Commercial Savings Company, which stock has this day been delivered to First Party, and First Party hereby agrees to pay for same the sum of $1600 payable at the rate of $200 per month, beginning July first, 1922; provided, however, that said monthly payments shall be made only in the event the terms of said lease have been complied with by the lessees therein; and that in the event said terms have not been complied with, First Party shall not be required to continue payment, but shall return to said Jones an amount of said stock equal to the unpaid balance of said $1600 and in such event First Party shall no longer be liable on his contract of purchase.

"In consideration of the premises, Second Parties agree that on July first, 1924, they will, repurchase the stock in said Commercial Savings Company so bought and paid for by First Party, and will pay therefor to First Party or assigns the sum paid by First Party for said stock, or will procure and produce a purchaser for said stock who will pay said First Party or his assigns the amount so paid for said stock by First Party; and said First Party hereby agrees to sell, transfer and deliver said stock upon receipt of such payment. Until the repurchase of said stock, First Party or assigns shall be entitled absolutely to any and all dividends that will be declared or

paid on said stock, if the dividends paid do not amount to a sum equal to six per cent per annum of the said sum of $1600 from July 1, 1922, to the date of said repurchase of said stock then Second Parties are to pay First Party said interest as part of the repurchase price of said stock.

"Witness Our Hands this 21st day of July, 1922.

"(Signed)    CHARLES W. SCARRITT
"W. L. JONES
"COMMERCIAL SAYINGS COMPANY
"By W. L. JONES, President."

Bearing the same date the Scarritt Estate Company made a lease with W. L. Jones and the Commercial Savings Company, beginning on July 1, 1922, and extending until the 30th day of June, 1927. The rent specified in the lease was as follows: "$600 per month for the first year; $1250 per month for the second year; $1350 per month for the third year; $1500 per month for the fourth year; $2100 per month for the fifth year, provided that if the aggregate amount of the deposits and investments with, and individual loans to, the lessee company does not amount to one million dollars at any time during the months of April, May or June, 1926, the rent for the fifth year shall be eighteen hundred dollars ($1800) per month."

The rent was to be paid in advance.

The fixtures were pledged in the lease as security for the rent covering the full term.

Another contract bearing the same date was received in evidence, the material part of which is—"First party agrees to enter into a lease of said room with Second Parties for a term of five years at a rental of $600 per month for the first year, $1250 per month for the second year, $1350 per month for the third year, $1500 per month for the fourth year and $2100 per month for the fifth year, providing Second Parties will purchase the banking fixtures now situated on said premises free and clear from any liens or encumbrances."

A pamphlet was introduced in evidence showing C. W. Scarritt as Vice-President.

Mr. C. W. Scarritt took over the stock in accordance with his contract heretofore set out and paid thereon the sum of $800 before the Company quit paying its rent to Scarritt Estate Company. The Commercial Savings Company paid rent for four months and upon default C. W. Scarritt returned his certificate of stock and wrote Mr. Jones as follows:

"Referring to our arrangement of July 21, 1922, under which I conditionally purchased from you sixteen shares of the Commercial Savings Company, will say that the conditions of said arrangement have not been complied with, and I am herewith returning to you the certificate of said shares properly endorsed, which you can have reissued to you on the books of said Company at your convenience."

Defendant Scarritt testified that he had no knowledge at the time he took the stock that it had not been paid for.

Defendant Scarritt testified that he had no knowledge that his name was being used as an officer in the Commercial Savings Company until after the public "exposition."

After the public exposition was in the papers, Mr. Scarritt wrote a letter to Mr. W. L. Jones reciting that Mr. Jones had no right to use his name and demanding that all literature carrying his name should be destroyed.

The law is well settled as stated in 2 Fletcher Cyc. Corps. 1924 Supp., sec. 3597, p. 766:

"Whether there is any liability on the part of the transferee depends upon whether he has a bona-fide purchaser. If he purchased with notice, actual or constructive, that the stock was not in fact fully paid up, he is subject to the same liability as his transferror; but he is not liable at all if he purchased without such notice, since fraud is the basis of the liability of the stockholder, and if he had no notice he cannot be guilty of fraud. It is sufficient to impose liability upon the transferee to show that when he accepted his stock he had notice or knowledge of its real character."

This rule is followed in Missouri, Erskine v. Lowenstein, 82 Mo. 301; Johnson v. Lullman, 15 Mo. App. 55; Johnson v. Lullman, 88 Mo. 567. This seems to be the rule in other states: French v. Harding, 235 Pa. 79; West Nashville Planing Mill Co. v. Savings Bank, 86 Tenn. 252; Gillett v. Chicago Title & Trust Co., 230 Ill. 373.

In fact there seems to be no difference of opinion as to that statement of the law.

There is no question as to the buying of the stock, the terms under which it was bought and that the stock so bought was fraudulently issued.

This leaves but three questions for solution: First: Did defendant Scarritt know when he purchased the sixteen shares of stock that the stock was fraudulently issued? Second: Is the allegation in the petition "or by the exercise of ordinary care could have known" sufficient to allow a finding in accordance with that allegation? Third: Even if the petition is sufficient, does the evidence justify such a finding?

Upon the first question: The stock certificate was in usual form. Mr. Jones testified he did not tell Mr. Scarritt anything about the stock not being paid up. Mr. Scarritt testfiied he did not know of the fraudulent issue. We think that the evidence does not justify a finding that Mr. Scarritt knew that the stock was fraudulently issued.

The second question: Did the pleadings justify a finding that defendant Scarritt could by the exercise of ordinary care, have known that the stock was not paid for. Appellant insists that the general allegation is a mere legal conclusion and a finding based upon that allegation cannot stand.

Before discussing the cases it is well to bear in mind that there is a distinction between those cases where a defect is raised before trial and those cases where after issue voluntarily joined, and a verdict rendered, the petition is attacked. This difference is pointed out in Snyder v. Wagner Elec. Mfg. Co., 284 Mo. 285, 1. c. 306: "It is sufficient to say that it covers, especially after issue voluntarily joined by answer, all knowledge imputed by the law, whether actual or constructive."

The voluntary joining of issue seems to be held a sufficient indication that the facts are stated to the satisfaction of the defendant. [Snyder v. Wagner Elec. Mfg. Co., supra.]

In support of his contention appellant cites first, Smith v. Sims, 77 Mo. 269. In that case there was a general allegation that the allowance was procured on the fraudulent representations, "that the note was valid." There was a demurrer to the petition. The Supreme Court on appeal held that the demurrer should have been sustained, and in discussing that question used language upon which the appellant relies. That question was very different from the question here presented. We think therefore, Smith v. Sims, supra, is not in point.

In Mallinckrodt Chemical Works v. Nemnich, 169 Mo. 388, a demurrer to the petition was sustained. It therefore appears that nothing said in that case applies to the question in the case at bar.

Defendant Scarritt cites in support of his premise the case of Hoester v. Sammelmann, 101 Mo. 619. This case falls within rule in cases where the petition was attacked before the trial. The case of Robinson v. Wiese, 210 S. W. 889, is also relied upon by appellant. The language used in that case does give color to the contention of the respondent. A close investigation of Robinson v. Wiese, supra, will show however, that there was an objection to the introduction of any evidence under the petition. The objection was sustained. The court said in Robinson v. Wiese, supra, 1. c. 892: "The question is squarely presented whether the defendants were entitled to judgment upon the pleadings as they stood at the time the ruling of the court upon the admission of evidence was made."

The court in discussing the question states, that, if the plaintiff stood by and allowed a fraud to be perpetrated, they themselves would be guilty of fraud, and in effect held that there was no cause of action stated; that there was no equity stated in the petition. Further the petition was not aided by evidence and a finding as in the case at bar. Again the court said in Robinson v. Wiese, supra, 1. c. 895: "Assuming that the purchaser had no knowledge of any fraudulent element in their issue and sale, then the plaintiffs, for whose benefit they were sold, were, if they knew the facts in time, and failed to interfere, participants in the fraud against him, and he was innocent. If the purchaser shared their knowledge, both were equally guilty. It was necessary, therefore, that the plaintiffs should plead the facts

concerning their knowledge of the fraud to state a cause of action." Thus showing that the petition not only did not state a cause of action but that the petition affirmatively showed that plaintiffs were not entitled, upon the petition, to relief.

The facts in Robinson v. Wiese, supra, as detailed in the petition, did not show any opportunity on the part of Cahill to know of the matters complained of in plaintiff's petition. The court held that under such facts it was not enough to charge that Cahill could, by the exercise of care, have known these facts. In the case at bar the lease was pleaded and the facts showing the connection with the defunct company and defendant Scarritt were pleaded. To have pleaded the facts in connection with the allegation complained of by appellant would merely have necessitated a restatement of the facts as alleged, and then to have averred that he could, by the exercise of ordinary care, have known them. This is not required. We see no conflict between Robinson v. Wiese, supra, and the cases cited holding that when the facts are alleged, showing a liability on the part of the defendant and where the facts alleged point to acknowledge on defendant's part the pleadings are sufficient.

Again in the case of Current v. The Missouri Pacific Railway Company, 86 Mo. 62. the allegation "or by the exercise of due care might have known" is expressly approved. McQuillan in his work on "Pleadings and Practice," cites the Current v. The Missouri Pacific Railway Company, supra, as authority for the statement that the allegation "or by the exercise of due care might have known it" is proper.

There is authority which goes even further as was stated in Garbee v. St. Louis-San Francisco Ry. Co., 290 S. W. 655, 1. c. 656: "There was such evidence admitted without objection, and such being the case, the petition will be considered as amended to conform to the evidence."

In support thereof the court cites the following cases: Treece State Bank v. Wade et al. (Mo. App.), 283 S. W. 714; Missouri State Highway Commission ex rel. v. Cooper Construction Co. (Mo. App.), 286 S. W. 736.

There was no objection to the evidence in the case at bar.

We hold therefore, that the petition permits a finding that defendant Scarritt, by the exercise of ordinary care, could have known that the stock was fraudulently issued.

Passing now to the third question as to whether or not the evidence justifies a finding against defendant Scarritt. Defendant Scarritt was anxious to get a tenant for the banking room which was owned by the Scarritt Estate Company of which he was stockholder. A great disparity in the amount of rent for the various years appears in the lease. The second year the rent was more than twice as much as the first. Scarritt agreed to purchase the stock in the Commercial

Savings Trust Company only on the basis that the monthly rent for the room was paid. Payment for the stock, by his contract, was only contingent upon the payment of the rent by the Company. In two years Mr. Jones was to repurchase the stock with interest. This is unusual to say the least, if he had thought that the capital was paid up.

If he had doubts as to the ability to pay the rent, he must have doubted the payment of the capital stock. In the lease, which defendant Scarritt must have been familiar with, the bank fixtures were required to be paid for. This is different from having a lien upon the fixtures for the payment of rent. Mr. Jones personally, was made a party to the rental contract, which was not usual in leases to companies with capital paid up. C. W. Scarritt extended his payments for the stock over a period of eight months and made his payments dependent upon the company paying its rent. He quit paying on his stock when the Company quit paying its rent. The fact that his letter to Mr. Jones in which he consented to act as Vice-President, the contents which were given and not denied by Mr. Scarritt, indicated that he had some doubt as to whether or not it was a proper organization, and he stated he would serve if matters were "according to law." Ordinarily a man upon being made Vice-President of a concern would not put a suggestion such as that in his acceptance.

It is unnecessary and impracticable for a creditor or receiver to prove that each purchaser of stock was told that the stock he was taking was not paid for, but it is sufficient if such facts are established as properly leading to the inference of knowledge of the fraud on the part of the purchaser. The Illinois Court in defining the term "notice" as thus used in Garden City Sand Co. v. Crematory Co., 205 Ill. 42, 48, says: ". . . knowledge that the stock was unpaid, or knowledge of such facts as would have put an ordinarily prudent man upon inquiry, when the inquiry might reasonably be expected to have led him to knowledge that the stock was unpaid." [Gillett v. Chicago Title & Trust Co., supra, l. c. 411, 412.]

These facts were enough to have justified the chancellor in saying that Scarritt had information sufficient to put him on inquiry. If he had made inquiry the most flagrant violation of the law and the gross fraud perpetrated by Mr. Jones would have been discovered. An examination of the books would have shown that its entire assets consisted of a certificate of deposit in the Central Trust Company, and an investigation would have shown that the Central Trust Company was out of existence if in fact, it was ever in existence.

The chancellor was in a more favorable position that we are. We feel that we should defer to his findings. [Erskine v. Lowenstein, 82 Mo. 301, 309; In re Manufacturing Box & Lumber Co., 251 Fed. 957, 962.]

Judgment is affirmed. *Frank, C.,* concurs.

PER CURIAM:—The foregoing opinion by WILLIAMS, C., is adopted as the opinion of the court. *Bland* and *Arnold, JJ.,* concur; *Trimble, P. J.,* absent.