ANTON SCHULER, Public Administrator, in Charge of Estate of HELEN FRANK ROTH, v. ST. LOUIS CAN COMPANY, Appellant.— 18 S. W. (2d) 42.

Division Two, April 5, 1929.

766

*Banister, Leonard, Sibley & McRoberts* and *Frank P. Aschemeyer* for appellant.

*Mark D. Eagleton, A. F. Gerritzen* and *Hensley, Allen & Marsalek* for respondent.

HENWOOD, C.—This suit was originally filed in the name of Helen Frank, an infant, by Louise Searls, her next friend, for personal injuries suffered by the said Helen Frank while employed by defendant. The trial resulted in a verdict and judgment for plaintiff in the sum of $15,000, and defendant appealed. Pending the appeal, plaintiff was married to one Emil Roth and, thereafter, died. By order of the Probate Court of the City of St. Louis, Anton Schuler, Public Administrator of that city, was authorized to take charge of plaintiff's estate, and, upon proper suggestion of these facts and proper motion, the cause was, by this court, revived in the name of said Public Administrator, who has entered his appearance as respondent herein.

Plaintiff's cause of action, as pleaded, rests upon the doctrine known as *res ipsa loquitur*. In her petition, it is alleged, in sub-

stance, that she was employed in defendant's factory as operator of a certain machine or punch press; that the machine was operated by mechanical power and equipped with levers which the operator moved by hand for the purpose of stamping and forming sheets of metal; that, in the usual and ordinary operation of the machine, the upper die would descend upon the lower die, when the levers were pressed, and then ascend and remain stationary until the levers were pressed again; that on March 13, 1925, while she was working at the machine, and without any movement of the levers, the upper die descended in a sudden, unexpected and unusual manner, and crushed, lacerated and cut off parts of four fingers of her right hand; that she was not charged with the care and upkeep of the machine, and had no knowledge of the details of its construction and mechanism, nor of the cause of its unexpected and unusual operation which resulted in her injury; and that defendant possessed such knowledge and information, and had full charge and control of the machine and the pulleys, belts and other mechanical apparatus used in connection with its operation.

Defendant's answer is a general denial.

The following statement of plaintiff's evidence (with some alterations) is taken from appellant's brief:

"The plaintiff, testifying in her own behalf, said: She was injured in the afternoon of March 13, 1925, and had been employed by defendant since August, 1924, as a punch press operator. When injured she was engaged in punching holes in five-inch tin squares, the holes being three and one-half inches in diameter. During her employment, by defendant, she earned on the average of from twenty-two to twenty-five dollars a week. She was nineteen years of age at the time of her injury, and twenty at the time of the trial. She stood on a low box and faced the south while operating the machine in question. There was a foot pedal at the lower right hand portion of the machine, which was disconnected and not in use at the time. The machine was operated by means of two hand-levers, one extending on the right and the other on the left side of the machine. There was a box on the floor to the left of the operator from which she took the tin squares with her left hand, passing them to her right hand and then inserting them with her right hand over the lower die in the bed of the machine. When the upper die was at rest, it was about one foot above the lower die. In placing the tin squares on the lower die, it was necessary to put her right hand underneath the upper die or between the two dies, because she had to push them down and fit them in the bottom of the lower die. She was injured when the machine repeated while she was putting a piece of material into the machine with her right hand. She did not touch the foot pedal, which was disconnected, nor either of the hand-levers. In the ordinary course of operation, the upper plunger or die would not come down until both of the levers had been pressed. In operating the machine,

she would press the lever on the right side of the machine with her right hand, and the lever on the left side of the machine with her left hand, but the lever on the left-hand side would go down without being pressed as hard as the one on the right. This machine had repeated three or four times before, and she reported the matter to Mr. Guntly, who was her foreman. On the first occasion, he sent a Mr. Miller to repair the machine. On the subsequent occasions, when the machine repeated, Mr. Guntly put her on other work at other presses. Parts of four fingers of her right hand were amputated by the machine, and, at the time of the trial, the tips of the fingers were painful and sensitive. She had pain when she touched anything with them, and she had not been free from pain since the time of her accident. Immediately after the accident, she was taken to see a Dr. Coryell, who treated her. The index finger of her right hand was amputated just back of the fingernail, so that a small portion of the fingernail still remains on the end of the finger. The middle finger and the ring finger of the right hand were cut off in the middle phalanx; that is, they were amputated at a point between the first and the second joints. The little finger was amputated just behind the fingernail. The first joints of the index and little fingers and the second joints of her middle and ring fingers were stiff. She was an experienced punch press operator, and had worked on punch presses before she was employed by defendant. During the time she worked for defendant, she operated the particular punch press in question about a month. She had been employed formerly by the Christian Board of Publication, where she operated a folding machine, and earned about $18 a week. She had not been instructed to hold the tin squares in such a way as not to get the fingers of her right hand under the upper die. There was a wire hook kept at the press, which the operator could use in removing any material which might become caught in the press. Dr. Coryell treated her until March 28, 1925, when she left him voluntarily and went to Dr. Meehan. She had not done any work of any kind nor earned any money since she was injured.

"Dr. George T. Meehan, testifying in behalf of plaintiff, stated: He first examined her right hand on March 29, 1925. He found her to be suffering from an artificial amputation of a portion of the second, third, fourth and fifth fingers of her right hand. The index finger and the little finger showed some signs of infection, and the third and the fourth fingers were also somewhat infected. The infection responded to treatment and was entirely cured. At the time of the trial, the fingertips were thoroughly healed, but there was marked knobbing, particularly of the third and fourth fingers. There was also scar tissue on the ends of the index finger and the little finger, with an inability to close the hand or to grip. The index finger could be flexed, but not sufficiently to touch the palm. The

third and fourth fingers could be flexed to almost a right angle with the palm. The little finger could be flexed sufficiently to touch the palm, but with very little pressure. The hand was painful, and the fingers were sensitive to touch, especially the third finger, which rendered the hand incapable of gripping. There was marked atrophy in the hand, due to its disuse and inability to function. In his opinion, the hand would continue to be painful, and the pain rather constant. His charge for services was $250.''

According to the evidence offered by defendant, the machine in question was inspected immediately after the accident and found to be in good working order. It could not be operated without pressing both levers and did not repeat when so operated. Neither plaintiff nor any other operator of the machine had previously complained about it repeating or otherwise failing to function properly, and it had not been repaired by Mr. Miller nor by any other person, at plaintiff's instance. The machine had been in constant operation since the day of the accident, without repairs and without repeating or failing to work in the usual and ordinary way. It was not necessary for plaintiff to put her hand under the upper die of the machine, and she and all of the other operators were instructed to hold the tin squares by the corners thereof and to keep their hands out of the way of the upper die. Signs were posted in the press room, by which all operators were notified to that effect. Several of defendant's operators and other employees testified that the machine in question worked normally and without repeating, both before and after the accident, but two other operators said that defendant's machines did repeat on numerous occasions, and one of them said that the machine in question had repeated while she was operating it.

Dr. J. B. Coryell, testifying on behalf of defendant, said that he treated plaintiff from the day of her injury, March 13, 1925, until March 28, 1925; that he amputated parts of four fingers of her right hand, and the results of his surgical operation were good; that, when plaintiff discontinued his services, her fingers were ''about ninety per cent healed;'' that they showed no indication of sensitiveness to simple, normal touch, at that time; and that, in his opinion, she could use her right hand in operating a punch press, and also in doing the work which Mr. Straube said she did in a bindery, after she was injured.

Mr. Henry Straube testified, for defendant, that he was foreman of the bindery of the Christian Board of Publication; that plaintiff worked under him in the bindery prior to her employment by defendant, and, after her injury at defendant's factory, she worked at the bindery, from the latter part of July until the latter part of October, 1925; that she worked every day, attending a folding machine and doing other work in which it was necessary for her to use both hands, that her wages were the same then as the wages she re-

ceived during her previous employment in the bindery; that her work was satisfactory, and she quit her job there voluntarily.

It was also shown by defendant's superintendent that, according to the books of the company, plaintiff's wages averaged $16 per week during the time of her employment by defendant.

Other facts and circumstances developed by plaintiff, upon cross-examination of two of defendant's witnesses, will be noted in the further discussion of the case.

I. It is urged that the trial court erred in permitting plaintiff's counsel to examine members of the jury panel, on their *voir dire*, and to cross-examine two of defendant's witnesses, concerning their relations with a certain insurance agency, and that defendant's motions to discharge the jury should have been sustained, on the ground that such examinations were improper and prejudicial.

(a) The members of the jury panel were interrogated in the following manner:

"I will ask you gentlemen, whether or not any of you do business with T. H. Mastin & Company?

"Gentlemen, I asked you a question whether or not any of you have any connection with T. H. Mastin & Company?

"Do you know Mr. Simpson, an adjuster for that company; or Mr. R. H. Davis, an adjuster for that company, either of those men?

"Any of you policyholders in that company?

"I will ask you, to make it clear, if you know T. H. Mastin & Co., attorneys in fact for the underwriters of an insurance company whose home office is in Kansas City, and whose agency is the Commonwealth Insurance Agency in the Pierce Building, located across the street in the city of St. Louis, Missouri; do you know any of those people?"

During the course of this interrogation, and in response to the statement of defendant's counsel that such questions were not asked in good faith, but for the purpose of giving the jury improper and prejudicial information, plaintiff's counsel said:

"If the court please, I am not attempting to give them any information. The rules of the court do not permit me to give information to the jury. That is a question to the jury, and was made in accordance with the question asked counsel outside of the presence and hearing of the jury."

The record shows that, prior to this interrogation of the jury panel, plaintiff's counsel, in the presence of the court and out of the presence and hearing of the jurors, requested defendant's counsel to state whether or not he represented T. H. Mastin & Company in the defense of this case, and whether or not Mr. Simpson, of that company, investigated the case and talked to the witnesses, and defend-

ant's counsel said: "I refuse to answer." The record further shows that, after asking the jury panel the first question above quoted and after the challenge of his good faith in so doing, plaintiff's counsel was sworn and testified, before the court in chambers and out of the presence and hearing of the jurors, as follows:

"I wish to state that, upon writing the defendant in this case, I was informed that the T. H. Mastin & Company was their insurer and that they carried liability insurance protecting them in this particular case, and was referred to said insurance company, and, subsequently thereto, I took the matter up with Mr. R. H. Davis, whom I know to be the claim agent employed by T. H. Mastin & Company; and further, I know that Mr. Simpson has interviewed Witness Glare, Witness Sharem, Witness Gant, Witness Stanboy and other witnesses at the plant of the assured, and also has talked with and negotiated with my client in this case. Let me add to my testimony the fact that I know that Davis and Simpson, the adjusters referred to, have an office in the Pierce Building, located immediately across from this courthouse, and have been in and out of the courtroom in Division No. 1 while this case was pending prior to assignment."

And the record further shows that, before plaintiff closed her case in chief, Mr. Simpson was subpoenaed and testified, out of the presence and hearing of the jury, that he is an adjuster for T. H. Mastin & Company; that T. H. Mastin & Company are attorneys in fact for the Consolidated Underwriters, who operate a reciprocal insurance exchange in Kansas City; and that he investigated this case, obtained written statements from the witnesses, and submitted such statements to the home office in Kansas City. And, in connection with this testimony, counsel for defendant admitted that Mr. Simpson had previously attended the trial to consult with him concerning the case and to arrange for the attendance of defendant's witnesses.

With this proof and these admissions before it, the trial court would have been fully justified in concluding, not only that T. H. Mastin & Company had a financial interest in this case, but also that they were in charge of the defense of the case. And, under such circumstances, it was eminently fair and proper for plaintiff to interrogate prospective jurors as to their relations with that company, in order that she might act advisedly in making her challenges of such jurors as she saw fit. Nor, in our opinion, does the record show any improper or prejudicial remarks on the part of plaintiff's counsel, either in his interrogation of the jury panel along this line, or in his reply to the charge of bad faith made by defendant's counsel in the presence and hearing of the jury. [Maurizi v. Western Coal & Mining Co. (Mo. Sup. in banc), 11 S. W. (2d) 268; Cazzell v. Schofield (Mo. Sup.), 8 S. W. (2d) 580; Melican v. Whitlow Const. Co. (Mo. Sup.), 278 S. W. 361; Wagner v. Gilsonite Const Co. (Mo.

Sup.), 220 S. W. 890; Kinney v. St. Ry. Co., 261 Mo. 97, 169 S. W. 23.]

(b) The cross-examination complained of appears in the testimony of Herbert De Staebler, consulting engineer, who inspected the machine in question after the accident and testified that it was in good working order and did not repeat, and in the testimony of Dr. Coryell as to the nature and extent of plaintiff's injuries.

In the cross-examination of the witness De Staebler:

"Q. At whose request did you go down there to make this inspection?

(Objection, ruling and exception.)

"Q. Who sent you down there? A. Mr. Simpson."

In the cross-examination of the witness Dr. Coryell:

"Q. Doctor, you are regular physician for practically every company in the city of St. Louis, down here at 309 South Broadway? A. Yes, sir.

"Q. And you make your living, and have for a number of years, at the behest of insurance companies, haven't you? A. Yes, sir.

(Objection, ruling and exception.)

"Q. You may answer, doctor. A. Practically all the companies doing business here.

"Q. How is that? A. Practically all the companies doing business here."

In view of the proof and admissions above shown as to the interest of the Mastin Company and its adjuster, Mr. Simpson, in the defense of this case, such cross-examination of these witnesses was entirely proper. The jury was entitled to know everything that might affect their credibility and the weight to be given their testimony, including their relations with parties interested in the result of the case. [Jablonowski v. Mfg. Co., 312 Mo. 173, 279 S. W. 89; Snyder v. Mfg. Co., 284 Mo. 285, 223 S. W. 911.]

II. The motion for a new trial contains no assignment of error relating to the testimony of plaintiff's witness Blanke, and, for that reason, the complaint made in appellant's brief, as to the admission of certain testimony given by such witness, will be disregarded.

III. It is also contended that the trial court erred in refusing defendant's Instruction B and F, which read as follows:

"B. The court instructs you that if you find and believe from the evidence that defendant had instructed plaintiff not to place her hands or any portion thereof between the dies of the punch mentioned in the evidence and that, on the occasion when she was injured, she placed a portion of the fingers of her right hand between said dies,

and if you further find and believe from the evidence *that said act, if you so find, was the sole cause of plaintiff's injuries, and that defendant was not guilty of any negligence contributing thereto,* if you so find, then the plaintiff is not entitled to recover, and your verdict must be for defendant.

"F. The burden of proof is on the plaintiff to establish by a preponderance of the evidence *the facts necessary to a verdict in her favor under these instructions.*

"By the terms 'burden of proof' and 'preponderance of the evidence,' *the court intends no reference to the number of witnesses testifying concerning any fact or upon any issue in the case,* but simply uses those terms by way of briefly expressing the rule of law which is that unless the evidence (as to such issue) appears in your judgment to preponderate, in respect to its credibility, in favor of the party to this action on whom the burden of proof (as to such issue) rests, then you should find against such party on said issue." (Italics ours.)

As we view Instruction B, in connection with the evidence as a whole, it is, in effect, an instruction on contributory negligence. So considered, the instruction was improper because defendant's answer contains no plea of contributory negligence, and, unless pleaded, contributory negligence is not available as a defense. [Lauck v. Reis, 310 Mo. 184, 274 S. W. 827; Benjamin v. St. Ry. Co., 245 Mo. 598, 151 S. W. 91.] For previous rulings of this court upon like instructions, given under like circumstances, see Keppler v. Wells, 238 S. W. l. c. 428, and Collett v. Kuhlman, 243 Mo. l. c. 590, 591, 147 S. W. l. c. 968. See, also, Boland v. Ry. Co. (Mo. Sup.), 284 S. W. l. c. 145, and Lyons v. Wells (Mo. App.), 270 S. W. l. c. 132. By plaintiff's Instruction 1 and defendant's Instructions 2 and 7, it was made perfectly clear to the jury that plaintiff was not entitled to recover unless they found that her injuries were caused by defendant's negligence. If, as defendant contends, Instruction B did not involve the question of contributory negligence, then, in offering such instruction, defendant assumed an unnecessary burden, in requiring the jury to find that plaintiff's injuries were caused solely by her own negligence as one of the prerequisites to a verdict in its favor, and the refusal of the instruction was beneficial, rather than harmful, to defendant.

The second part of Instruction F, or the part contained in the second paragraph, which says "By the terms 'burden of proof' and 'preponderance of evidence,' the court intends no reference to the number of witnesses testifying concerning any fact or upon any issue in the case," etc., has been expressly held to be technically erroneous, in numerous decisions of this court, including the decision in the case of Nelson v. Heinz Stove Co., 8 S. W. (2d) l. c. 920, relied upon by defendant in support of its

contention that this instruction should have been given. See, also, Peppers v. Ry. Co., 316 Mo. l. c. 1114, 295 S. W. l. c. 761; Trautmann v. Trautmann, 300 Mo. l. c. 323, 254 S. W. l. c. 289; Hite v. Ry. Co. (Mo. Sup.), 225 S. W. l. c. 921. True, the giving of this instruction was not held to constitute reversible error in any of the cases above mentioned, but, certainly, after holding that an instruction of this character is technically erroneous, we cannot say that it was error to refuse it. Moreover, plaintiff's testimony, on the issue of defendant's negligence, was contradicted by nine witnesses and supported by only two witnesses, and it is apparent that defendant was benefited, and not harmed, by the refusal of this part of Instruction F. Inasmuch as the second part of the instruction was erroneous, and justified a refusal of the whole instruction, it becomes unnecessary to decide whether or not the first part of the instruction, which says "the burden of proof is on plaintiff to establish by a preponderance of the evidence the facts necessary to a verdict in her favor under these instructions," was a proper instruction, or one to which defendant was entitled, under the pleadings, evidence and other instructions in this case.

IV. Finally, we come to the contention that the judgment of $15-000 is excessive.

According to her testimony, plaintiff was nineteen years of age, and was earning from $22 to $25 per week at the time she was injured, in March, 1925. From that time until the time of the trial, in January, 1926, she was unable to do any kind of work, or earn any money. She was obligated to pay $250 for medical treatment. She lost parts of all of the fingers of her right hand except the thumb. The index finger and little finger were amputated immediately back of the fingernails. The third and fourth fingers were amputated between the first and second joints. At the time of the trial, the first joints of the index and little fingers and the second joints of the third and fourth fingers were stiff. The index finger could be flexed, but not sufficiently to touch the palm. The third and fourth fingers could be flexed to almost a right angle with the palm. The little finger could be flexed sufficiently to touch the palm, but with very little pressure. The hand was capable of very little, if any, gripping power. There was marked knobbing of the fingers, especially of the third and fourth. Nerve tissue, involved in the scar tissue, caused the fingers to be painful and sensitive to touch. The hand had shrunken from disuse and inability of the fingers to function. Plaintiff had suffered much pain and mental anguish, and the indications were that she would continue to so suffer. Her earning capacity and opportunities for advancement in life were permanently lessened and impaired. Obviously, the jury and the trial court were impressed with the

serious results of her injuries. We are likewise impressed, But, after carefully considering the question of damages in this case, in connection with our rulings in similar cases, it is our conclusion that the judgment is excessive, and that $10,000 is a fair compensation for her injuries. [Wagner v. Const. Co. (Mo. Sup.), 220 S. W. 890; Guidice v. Mfg. Co. (Mo. Sup.), 8 S. W. (2d) 964.]

If respondent will, within ten days, file a *remittitur* of $5000 in this court, the judgment will be affirmed for $10,000, as of the date of the original judgment; otherwise, the judgment will be reversed, and the cause remanded. *Davis, C.,* concurs; *Cooley, C.,* not sitting.

PER CURIAM:—The foregoing opinion by HENWOOD, C., is adopted as the opinion of the court. All of the judges concur.