Regina LEAVITT, Plaintiff (Respondent),

v.

ST. LOUIS PUBLIC SERVICE COMPANY, a Corporation, Defendant (Appellant).

No. 30506.

St. Louis Court of Appeals.

Missouri.

Nov. 15, 1960.

Frank B. Green, William Corrigan, St. Louis, for defendant-appellant.

Robert E. Staed, St. Louis, for plaintiff-respondent.

DOERNER, Commissioner.

Plaintiff Regina Leavitt brought this action for damages for personal injuries claimed to have occurred when the rear doors of defendant's motorbus, on which she was a passenger, were closed on her as she was in the act of alighting, causing her to fall to the street. Verdict and judgment was for $7,000 and defendant appealed.

Defendant attacks the judgment on numerous grounds: (1) that plaintiff's testimony as to the manner in which the accident occurred was contrary to physical possibility, and therefore should not have been accepted as substantial evidence, entitling her to go to the jury; (2) that prejudicial error was committed in giving plaintiff's instruction number one; (3) that the trial court erred in overruling defendant's challenges for cause to two veniremen; (4) that its motion for a mistrial should have been sustained when plaintiff injected the subject of insurance into the case; (5) that there was no evidence that plaintiff had sustained any permanent injury, and hence that plaintiff's instruction on damages was prejudicially erroneous in submitting that element of damage; and (6) that the verdict and judgment is excessive. These challenges will be considered seriatim.

A consideration of the first assignment requires a statement of plaintiff's testimony. Plaintiff was a married woman, 57 years of age on the day of the accident. On the morning of March 21, 1958, on her way to work, she boarded one of defendant's Southside Express motorbuses at a stop a few doors from her home, paid her fare, and took a seat near the operator. When the bus neared the stop at which she intended to alight, at Twelfth and Clark in St. Louis, she signalled the operator and walked to the rear exit doors, located near the center of the bus, on the right side. The bus was stopped at an angle from the curb, the rear end being farther away than the front end, leaving a space of about two or three feet between the rear doors and the curb. One other passenger, a young woman, preceded plaintiff, and alighted by jumping from the bottom step to the curb.

Plaintiff stated that she stepped from the floor of the bus to the bottom step, or stairwell, held on to a bar or the seat, which was inside the bus, with her right hand, and paused to consider whether to step down to the street, or to jump to the curb. She decided to follow the example of the young woman who had preceded her, by jumping to the curb. Still holding on with her right hand, she was facing mostly forward, but a little to her right, or to the south. She started to step forward, with her left leg extended in the air. At that instant she felt the doors close on her, hitting her right arm and her right foot. Startled, she released her grip on the bar, was thrown off balance, and fell prone to the street, with her head to the south.

Defendant's evidence was that the rear doorway of the bus was about 22 inches wide. The aperture was enclosed by two folding doors, each of which had a two-inch piece of rubber on its leading edge, where they met when closed. Inside of the rubber was an electric cable, connected to a switch, so designed and constructed that if the operator closed the doors on a

person or object, the doors would automatically open as soon as they made contact. It was stated by one of defendant's witnesses that the pressure felt by a person upon whom the doors closed would not be over three or four pounds. It was also stated orally, and corroborated by motion pictures which the defendant exhibited at the hearing of the appeal, that the rear doors closed across the outer edge of the bottom step of the bus, and flush with the side of the bus.

From this, defendant argues that if the plaintiff's right foot was on the bottom step of the bus, and *only* her left foot extended beyond the outer edge of the bottom step, it would have been physically impossible for the doors to have come in contact with plaintiff's right arm and right foot as they closed. The word *only* is the key word in its argument. Defendant views the evidence as though plaintiff moved in a mechanical fashion, with a pause or hesitation after raising her left foot. However, it is apparent from a careful review of plaintiff's testimony that in addition to raising and extending her left foot, she was in the process of stepping or jumping from the bus to the curb. There is no testimony in the record as to the depth of the bottom step, but it was apparent in the motion pictures shown us that it is, and of necessity must be, rather shallow. It was also apparent from such pictures that if a passenger stood on the bottom step, holding on to the bar with his right hand, only a slight forward tilt of his body was required to bring it between the doors as they closed. Plaintiff was unshakeable in her testimony that the doors hit her right arm, between the elbow and the shoulder, and her right foot.

Viewing the evidence in the light most favorable to the plaintiff, there was sufficient substantial evidence from which the jury could find that the doors struck plaintiff's right arm and right foot as she was in the act of jumping to the curb.

Certainly the plaintiff's testimony was not so clearly contrary to physical facts or laws as to justify us in declaring as a matter of law, as in Lohmann v. Wabash R. Co., 364 Mo. 910, 269 S.W.2d 885, that it should be disregarded. Courts are reluctant to say that declared facts are manifestly impossible or untrue, Doyle v. St. Louis Merchants' Bridge Terminal R. Co., 326 Mo. 425, 31 S.W.2d 1010, and should not indulge in arbitrary deductions from physical laws and facts except when they appear to be so clear and unrefutable that no room is left for the entertainment, by reasonable minds, of any other conclusion. Garrison v. Ryno, Mo., 328 S.W.2d 557; Lansford v. Southwest Lime Co., Mo., 266 S.W.2d 564. It should be added that the testimony of Richard Huntsberger, the only witness called by either party who saw what transpired, fully corroborated plaintiff's version of the manner in which the doors struck plaintiff.

■ Turning to defendant's second assignment, plaintiff's instruction number one informed the jury, in part, that if it found from the evidence that plaintiff became a passenger on defendant's bus which stopped to discharge her and other passengers, "* * * and that as she was attempting to alight from the exit doors on the right side of the bus, the exit doors closed on her, causing her to fall to the street, and be injured, if you so find, then you are instructed that such facts, (if you find them to be true,) * *." Defendant complains that in the quoted part of the instruction a controverted fact was assumed, namely, that the closing of the doors caused plaintiff to fall. We find no merit in this contention. The instruction is prefaced by the phrase "* * * if you find from the evidence * * *" and then recites the facts to be found, immediately followed by the cautionary phrase, "if you so find" as well as the further phrase requiring the jury to find such facts to be true. In our judgment the instruction assumed nothing, and plainly told the jury that it must find, as a prerequisite to a verdict for plaintiff, that it was the closing of the doors on plaintiff which caused her to fall. Bidleman v. Morrison Motor Freight, Mo.App., 273 S.W.2d 745. The cases cited in support of defendant's argument, while supporting the rule that the assumption of a material controverted fact in a verdict directing instruction constitutes reversible error, are clearly distinguishable from the present case.

Defendant's third assignment relates to the overruling by the court of defendant's challenges for cause of two veniremen. The first, named Fritschie, had been struck by an automobile in May, 1959 (the trial started on October 13, 1959), and had employed an attorney to prosecute his claim, but no suit had been filed. The second, named Wischmeyer, had been involved in an automobile accident which had occurred on June 8, 1959, had brought suit for the personal injuries he sustained therefrom, and stated that he imagined he was being "cross-sued." The instant defendant was not involved in either Fritschie's claim or Wischmeyer's suit. Both veniremen were positive in their testimony that the matters in which they were involved would not affect or influence them in any way, and that they could give both parties a fair and impartial trial.

■ Clearly, the veniremen were not disqualified on any statutory grounds, Section 494.190 RSMo 1949, V.A.M.S. That fact, however, is not conclusive, for the enumeration of certain grounds in the statute does not preclude the court from removing a prospective juror for other grounds of incompetency. Kendall v. Prudential Life Insurance Co. of America, Mo., 327 S.W.2d 174; Murphy v. Cole, 338 Mo. 13, 88 S.W.2d 1023, 103 A.L.R. 505. And, where a challenge for cause has been sustained because the pecuniary interest of the juror, or his business or other relationship to one of the parties, such action

has been upheld on appeal. The exercise by a trial court of its discretion in that regard should be encouraged. For with " * * * the world absolutely filled with competent, unbiased, and unprejudiced jurors, * * *." State v. Mace, 262 Mo. 143, 155, 170 S.W. 1105, 1109, it would be prudent to resolve a substantial doubt as to a venireman's competency against him, Moss v. Mindlin's, Inc., Mo., 301 S.W.2d 761, so as to excuse any juror whose sitting is reasonably liable to fill either party with an apprehension of unfairness. Glasgow v. Metropolitan Street Railway Co., 191 Mo. 347, 89 S.W. 915.

However, the question before us is not one of prudence or circumspection. What we are called upon to determine is whether the court abused its discretion in overruling the challenges and thereby committed reversible error. What the defendant contends, in effect, is that regardless of the fact that no bias or prejudice on the part of the venireman was shown, we should hold that such incompetency should be conclusively presumed as a matter of law under the circumstances existing in this case. While, as we have pointed out, the appellate courts have almost uniformly approved the action of a trial court in removing a doubtful juror, it is equally true that they have likewise upheld the trial court when it overruled challenges for cause, where no actual bias or prejudice was shown, even though a juror had some business or personal relationship with a party. Kendall v. Prudential Life Insurance Co. of America, supra; Grimm v. Gargis, Mo., 303 S.W.2d 43. These and numerous other Missouri cases state the rule to be that the trial court is and should be vested with broad discretion in determining the qualifications of veniremen to sit as jurors and that its rulings should not be disturbed unless they are clearly and manifestly against the evidence. Strahl v. Turner, Mo., 310 S.W.2d 833, 69 A.L.R.2d 646; Paige v. Missouri Pacific Railroad Co., Mo., 323 S.W.2d 753.

The closest Missouri case on the facts is that of Moss v. Mindlin's, Inc., supra, an action to recover damages for personal injuries, in which one venireman testified that he was the plaintiff in a pending suit for personal injuries sustained in an automobile accident, and that a judgment had been obtained but was not yet collected because of the failure of the insurance carrier. Another venireman had sustained a crushed disc in an industrial accident, the same kind of injury claimed to have been suffered by plaintiff Moss. Both testified that their experiences would not influence them in any way, and the court refused to remove them for cause. On appeal, it was said (301 S.W.2d loc. cit. 771, 772):

" * * * However, it is equally true that, on review by an appellate court, unless there is some fact which, we reasonably can say, in and of itself, necessarily showed prejudice, or unless there is an admission of prejudice, past or present, or unless there is something in the demeanor of the venireman which, despite his actual words, discloses the existence of prejudice in fact, we should not convict the trial court of an abuse of discretion in overruling a challenge for cause. In the instant case, both venireman [sic] said that none of their experiences would prejudice them against the defendant. We reasonably cannot hold that the matters disclosed were of the kind or nature which must of necessity have resulted in prejudice against the defendant, and we cannot on this record pass upon such matters as the demeanor of a particular venireman. Consequently, we must hold that the trial court did not abuse its discretion in overruling the challenges for cause. See Hieber v. Thompson, Mo.App., 252 S.W.2d 116, 122 [8, 9] [10]."

On the authority of that case, we are constrained to hold that the court did not abuse its discretion in overruling defendant's challenges for cause.

One of the witnesses called to the stand by defendant was Norman Lee Atkins. On direct examination, in addition to inquiring about the witness' name, age, and place of residence, counsel for defendant asked Atkins what his occupation was, and received the answer, "I'm a special investigator." It was then developed from Atkins that at the request of counsel for defendant, Atkins had taken motion pictures of the plaintiff hanging out laundry, entering an automobile, and engaging in other activities, which were subsequently exhibited to the jury. At the beginning of the cross-examination the following occurred:

"Q. * * * Mr. Green asked you what your occupation was and you testified you were a special investigator, but he didn't ask you by whom you were employed. Will you tell us who you are employed by? A. Transit Casualty Company.

"Q. I didn't hear you. A. Transit Casualty Company.

"Q. Transit Casualty Company? A. Yes, sir.

"Q. Where are they located? A. 615 North Ninth Street.

"Q. Was it in the course of your employment, by Transit Casualty Company, that you went out and took these movies? A. At Mr. Green's request, yes, sir.

"Q. Mr. Green directed the taking of these movies? A. Mr. Green and Mr. Stevens.

"Q. Who is Mr. Stevens? A. Branch counsel, I believe he is called.

"Q. Where is his office? A. Same place.

"Q. Where is that? A. 615 North Ninth Street.

"Q. That is the Transit Casualty Company, too? A. Yes, sir.

"Q. Now, Transit Casualty Company is an insurance company? A. Transit Casualty Company is a—

"Q. Yes, that is the insurance company?

"Mr. Green: Will you step up, please, Mr. Staed? (The following proceedings were had out of the hearing of the jury:)

"Mr. Green: At this time I move the Court for a mistrial and ask that the jury be discharged for the reason that when the witness was asked for his employer he truthfully stated the Transit Casualty Company. Now, Mr. Staed has been proceeding to ask him about three or four times other questions which require the answer 'Transit Casualty Company,' and each time the witness truthfully answered and Mr. Staed has deliberately and obviously brought it in with an attempt to prejudice this defendant and by telling the jury there was an insurance company in this case, without any cause whatever.

"The Court: I will overrule your request, but don't ask anymore questions about an insurance company.

"(The following proceedings were had within the hearing of the jury.)

"The Court: Disregard that last question by Mr. Staed, members of the jury. You may proceed. * * *"

Defendant contends that the reference to Transit Casualty Company being an insurance company was wholly irrelevant, patently mischievous, calculated to inflame the jury, and that the court abused its dis-

cretion in overruling defendant's motion for a mistrial. Plaintiff's answer to this argument is that in identifying Atkins, counsel for defendant deliberately failed to reveal Atkins' employer; that the jury was left with the mistaken impression that Atkins was self-employed; and that plaintiff was entitled to reveal the true connection between the witness and his employer.

■ It is a long established rule that the unwarranted injection into a case of the fact that a litigant is covered by a policy of insurance is reversible error. McCaffery v. St. Louis Public Service Co., 363 Mo. 545, 252 S.W.2d 361; Phillips v. Vrooman, Mo., 251 S.W.2d 626; Pitcher v. Schoch, 345 Mo. 1184, 139 S.W.2d 463; Olian v. Olian, 332 Mo. 689, 59 S.W.2d 673. Nevertheless, the courts also recognize that there are instances when the disclosure of the relationship of an insurance company to a party, or to the trial, is proper. One exception to the general rule is that where an insurance company is actively participating in the case, then that fact may be made known if it affects either the admissibility of evidence, the weight to be given testimony, or the credibility of a witness. That rule was so stated in Grindstaff v. J. Goldberg & Sons Structural Steel Co., 328 Mo. 72, 40 S.W.2d 702, and reapproved by the Supreme Court En Banc in State ex rel. Tramill v. Shain et al., 349 Mo. 82, 161 S.W.2d 974. A long line of cases support the rule. Thus, in Snyder v. Wagner Electric Mfg. Co. of St. Louis, 284 Mo. 285, 223 S.W. 911, the court held that it was the interest of two witnesses (one of whom was the paid agent of the insurance company) and the weight to be given their testimony which made proper the disclosure of insurance. In Jablonowski v. Modern Cap Mfg. Co., 312 Mo. 173, 279 S.W. 89, a Dr. Kinder, testifying as a witness on behalf of the defendant, stated that when he went to the plaintiff's home to examine her he told her that he had been requested to do so by the defendant. On rebuttal, plaintiff testified that Dr. Kinder told her he was a doctor from the insurance company. The trial court refused to discharge the jury, and its refusal was assigned as error on appeal. The Supreme Court held that the interest and relationship of Dr. Kinder was relevant and material, and that the testimony of what Dr. Kinder had told her was admissible for the purpose of impeachment. In Schuler v. St. Louis Can Co., 322 Mo. 765, 18 S.W.2d 42, the court permitted plaintiff to develop on cross-examination of defendant's doctor that the witness made his living through his employment by practically all of the insurance companies doing business in St. Louis. On appeal the cross-examination was held proper, on the grounds that the jury was entitled to know everything that might affect the credibility of the witness and the weight to be given to his testimony, including his relationship with parties interested in the result of the case. And see Houfburg v. Kansas City Stock Yards Co. of Maine, Mo., 283 S.W. 2d 539; Dodd v. Independence Stove & Furnace Co., 330 Mo. 662, 51 S.W.2d 114; Warner v. Oriel Glass Co., 319 Mo. 1196, 8 S.W.2d 846, 60 A.L.R. 448; Clayton v. St. Louis Public Service Co., Mo.App., 276 S.W.2d 621; Carlson v. Kansas City, Clay County & St. Joseph Auto Transit Co., 221 Mo.App. 537, 282 S.W. 1037.

■ There can be no question but that Transit Casualty Company is interested in the outcome of this case. Out of the hearing of the jury, prior to the interrogation of the panel, counsel for plaintiff asked counsel for defendant whether any insurance company was so interested, and if so, its name, and was informed that the name of the insurance company was Transit Casualty Company. As pointed out by plaintiff, counsel developed from the witness Atkins that his occupation was that of "a special investigator," but did not inquire whether he was an independent, self-employed investigator or whether he was employed by another. As the cases heretofore cited reveal, under the circumstances plaintiff had the right to have the jury know not only

that Atkins was employed by Transit Casualty Company, since it affected his credibility and the weight to be given to his testimony, but also the relationship of Transit Casualty Company in the case. State ex rel. Tramill v. Shain, supra; Grindstaff v. J. Goldberg & Sons Structural Steel Co., supra. It follows that the court did not abuse its discretion in refusing to declare a mistrial.

Plaintiff's instruction number 8, on the issue of damages, informed the jury that if it found in favor of plaintiff it could, in assessing damages in her favor, take into consideration various elements, among them being that of any distinct permanent injury which it found from the evidence she was reasonably certain to suffer as a result of the accident. Defendant contends that there was no evidence introduced that plaintiff had sustained any permanent injury and therefore it was prejudicial error for the court to submit this element of damage to the jury. It also complains, in its sixth and last assignment, that the verdict was excessive. These points may be considered together, and require a statement of the pertinent evidence favorable to plaintiff.

Plaintiff testified that immediately following the accident she was conveyed to the City Hospital, where a cast was applied to her left leg, which extended from her foot almost to her hip. She was then taken to her home, but later, on the same day, she entered Missouri Baptist Hospital, where she remained for seventeen days. During that time she had pain in her left leg, which became swollen, and pain and loss of power in her right arm, which became black, from where it had been crushed or pinched, between the elbow and the shoulder. At the time she was discharged from the hospital, on April 7, 1958, the cast was still on her left leg, and was not removed until May 16, 1958. Between April 7, 1958, and the time she returned to work, June 30, 1958, she used a wheel chair and crutches, to get around, and a cane for about six weeks thereafter. At her doctor's suggestion she wore an elastic stocking for almost a year. At the time of the trial, on October 13, 1959, plaintiff stated that her right arm bothered her when she fastened her clothing in the back; that her left leg ached, was weak, and felt like it was going to collapse when she walked very far; that her left leg was swollen; and that her left knee was stiff to a certain extent, and if she sat very long it was hard for her to get up. Plaintiff also testified that she was still jittery; that it interfered with her work; and that she becomes upset more easily, and was crabby, all of which had developed since the occurrence.

The hospital records of the City Hospital and the x-rays taken on plaintiff's admission were introduced, as well as the hospital records of Missouri Baptist Hospital, and other x-rays taken on the day of the occurrence, and later. In brief, these disclosed that plaintiff had sustained a verticle linear fracture of about 6 cm's extending through the middle and posterior part of the proximal end of the tibia of the left leg, without any displacement; and traumatism to the right arm and shoulder.

Dr. George Rendleman, the physician who attended plaintiff, testified that he first saw plaintiff at Missouri Baptist Hospital on the day of the accident, and from his examination of her he diagnosed her condition as a linear fracture of her left tibia and traumatism to her right shoulder. He stated that the bone is well healed, but that plaintiff still complains of sensitiveness in the upper third of her left leg; that on October 12, 1959, he found the left leg was slightly swollen, so that it measured about one-half inch larger than her right leg; that the swelling in the left leg was due to scar tissue or vascular disturbance; and that the swelling "could be" the result of the fracture.

Using the x-rays taken on the day of the occurrence, and subsequently, Dr. Rendleman testified that they did not show any evidence of injury to the bones of plaintiff's

right shoulder or humerus; that those taken on March 21, 1958, showed the transverse linear fracture of the left tibia and arthritic spurs in the left knee joint; that those taken on April 17, 1959, showed " * * * the fracture line has disappeared, it is well healed and there is no displacement there"; and that the x-rays taken on the day of the accident revealed that the plaintiff had hypertrophic arthritis of her left knee. Testifying generally, he stated that trauma would aggravate such a condition. Dr. Rendleman said that when he last saw plaintiff (two days before he testified), plaintiff still complained of the knee. When asked what diagnosis he made, his answer was, "Well, she has hypertrophic arthritis there of her left knee"; and when inquiry was made, "Would that be aggravated by trauma?" his reply was, "It could be, yes, sir." At another point in his direct examination, with reference to plaintiff's hypertrophic arthritis, Dr. Rendleman was asked whether he had made any diagnosis of any change in its condition due to the accident, and answered, "Well, the condition was present. I don't know whether it has changed a great deal since the accident or not. Those are slow processes." Even as to the swelling of plaintiff's left leg, which he had noted on his last examination, his opinion as to whether it was the result of the accident was, "It could be."

To sustain her position that evidence of permanent injuries was introduced, plaintiff, in her brief, stresses that her evidence showed she had sustained a fracture of the left tibia and traumatism to her right shoulder; that her left leg was chronically swollen, and over eighteen months after the accident was found by Dr. Rendleman to be one-half inch larger than her right leg; that this swelling "could be" due to a vascular disturbance resulting from the fracture; that plaintiff had had hypertrophic arthritis which "could be" aggravated by trauma; and then quotes the following passage from the direct examination of Dr. Rendleman:

"Q. * * * Now, Doctor, I would like to have you to assume further, based on the diagnosis that you made of the fracture of the left leg, of the swelling of the left leg, which has persisted, the complaints to the right arm, of the aggravation of the arthritis in the left knee that has persisted for a period of some eighteen months, do you have an opinion as to the permanency of that condition? A. Her arthritis is a permanent condition.

"Q. Would you be able to state, Doctor, with medical certainty, with persistence of eighteen months that her complaints and condition will continue and be permanent? A. Yes, I would say so.

"Q. That they will be permanent? A. Yes."

On cross-examination Dr. Rendleman testified that the linear fracture of plaintiff's left tibia was only a small, thin crack in the bone, without any displacement; that his first examination of plaintiff's right arm revealed a discoloration on the external surface below the deltoid muscle, due to trauma and the rupture of a blood vessel below the skin, but that the x-rays showed no fractures; and that in his opinion plaintiff's arthritic condition in her left knee was in a moderately advanced condition on and prior to the day of the accident. Shown the x-rays taken on March 21, 1958, and those taken on April 17, 1959, and asked whether they showed the arthritic spurs to be the same or different, Dr. Rendleman replied, "I would say they are about the same."

Evidence of the long persistency of an injury may be proof of future trouble, but such evidence is not necessarily proof of a permanent injury. Weiner v. St. Louis Public Service Co., Mo., 87 S.W.2d 191. To entitle a plaintiff to recover damages for permanent injuries, the permanency of the injury must be shown

with reasonable certainty, and while absolute certainty is not required, mere conjecture or likelihood, or even a probability, of such injury will not sustain the allowance of damages therefor. Kiger v. Terminal Railroad Ass'n of St. Louis, Mo., 311 S.W. 2d 5; Weiner v. St. Louis Public Service Co., supra; Plank v. R. J. Brown Petroleum Co., 332 Mo. 1150, 61 S.W.2d 328. And, in the absence of evidence that an injury is permanent, it is reversible error to submit to the jury an instruction authorizing a recovery for a permanent injury. Weiner v. St. Louis Public Service Co., supra; Plank v. R. J. Brown Petroleum Co., supra; Heibel v. Robison, Mo.App., 316 S.W.2d 238.

■ It is significant that when Dr. Rendleman was asked for his opinion as to the permanency of the four injuries enumerated in the question heretofore quoted, he mentioned only one, arthritis, in his answer. Particularly so when his testimony as to the other injuries is reviewed. He had stated that the fracture of the tibia was well healed, and that there was no displacement. And while he testified that he had found, on his recent examination, that plaintiff's left leg was somewhat swollen, he had stated only that that condition "could be" due to scar tissue or some vascular disturbance resulting from the accident. A medical opinion that an injury might, could or would result from an accident is no more than an assurance that such a result is scientifically possible, and is not substantial evidence that it did occur. Kimmie v. Terminal R. R. Ass'n of St. Louis, 334 Mo. 596, 66 S.W.2d 561. As to plaintiff's right arm, the substance of his testimony was that there was a discoloration caused by a trauma, but no bone injury, and he was not asked for, and gave no testimony regarding plaintiff's complaint that the arm bothered her when she twisted it in back of her to fasten her clothing.

The question propounded assumed that there was evidence that the arthritis had been aggravated by the trauma, but it will be noted that in his answer Dr. Rendleman was careful to state only that, "The arthritis is permanent." This was no more than an opinion that the plaintiff's arthritic condition, which had existed prior to the accident, was permanent. Furthermore, his guarded reply was consistent with his prior testimony, for when asked whether the arthritic condition had been aggravated by the trauma, he replied only that it "could be."

■ At best, the evidence went no further than to show that plaintiff's prior arthritic condition might or could have been aggravated by the trauma, and was too speculative or conjectural on which to justify the submission of an instruction authorizing an award of damages for a permanent injury. Weiner v. St. Louis Public Service Co., supra; Kimmie v. Terminal R. R. Ass'n of St. Louis, supra; Lebrecht v. United Rys. Co. of St. Louis, Mo., 237 S.W. 112; Heibel v. Robison, supra.

■ Since it is impossible to tell what the jury may have allowed as for permanent injury, and cure the error by remittitur, the Commissioner recommends that the judgment be reversed and the cause remanded for a new trial on the issue of damages alone.

PER CURIAM.

The foregoing opinion by DOERNER, C., is adopted as the opinion of the court.

Accordingly, the judgment is reversed and the cause remanded for a new trial on the issue of damages alone.

WOLFE, P. J., and ANDERSON and RUDDY, JJ., concur.